**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 8 1997**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

### UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

DOROTHY DYE,

      Plaintiff-Appellant,

v.

UNITED STATES OF AMERICA,

      Defendant-Appellee.

No. 96-3055

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 95-2036-JWL)**

Ervin G. Johnston, Johnston, Ballweg & Tuley, Overland Park, KS, argued the cause for the appellant.

Teresa E. McLaughlin, United States Department of Justice, Washington DC, argued the cause for the appellee. Regina S. Moriarty assisted on the brief.

Before **PORFILIO**, **BARRETT**,[*] and **EBEL**, Circuit Judges.

**EBEL**, Circuit Judge.

---

    [*]Honorable James E. Barrett, Senior Circuit Judge, was unable to attend oral argument. However, Judge Barrett participated fully in the decision of the case.

During the 1980s, Dorothy Dye lost over $850,000 because of various improprieties committed by her stockbroker. When Dye became aware of these improprieties, she sued. In 1989, the stockbroker's former employers settled Dye's lawsuit for $572,905.97, of which $207,617.37 went to Dye's attorneys. On her 1989 tax return, Dye sought to characterize the settlement proceeds as a "long-term capital gain," and the attorneys' fees as a "capital expenditure." Dye reduced her total tax liability for 1989 by applying the "capital expenditure" against the settlement proceeds.

The IRS disallowed Dye's "capital expenditure" reduction, and demanded about $70,000 in additional 1989 tax, interest, and penalties. Dye paid the IRS the money it demanded, but timely sued for a refund under 28 U.S.C. § 1346(a)(1) (1994) and I.R.C. § 7422 (1994).

The district court granted summary judgment in favor of the IRS. Dye now appeals pursuant to 28 U.S.C. § 1291 (1994). Because the record adequately established that a substantial portion of Dye's legal expenditures were capital in nature, we conclude that it was error to have granted summary judgment to the IRS. Accordingly, we reverse and remand for further proceedings.

## BACKGROUND

This is an appeal from a grant of summary judgment. Thus, the following facts are uncontroverted or are considered in the light most favorable to Dye, the non-movant. See Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996). All reasonable inferences from the factual record have been drawn in favor of Dye.

In 1982, plaintiff-appellant Dorothy Dye delivered certain tax free municipal bonds and 1,058 shares of Phillips Petroleum stock to her stockbroker William Rosenberger.[1] She instructed Rosenberger to hold the shares and bonds in an account for her benefit.

In January 1983, Rosenberger moved Dye's shares and bonds into a margin account. From 1983 to 1987, Rosenberger executed securities transactions on this margin account that resulted in $383,423.63 in trading losses to Dye. These trading losses created a negative balance in the margin account, forcing Dye to pay $170,991.71 in interest from 1985 to 1988. In addition, Dye lost $229,558 in interest on her tax-free municipal bonds between 1982 and 1988, during which time all such interest was applied to support securities transactions executed on the margin account. Because of the "churning" in Dye's account, Dye incurred

---

[1]At that time, Rosenberger was employed by B.C. Christopher Securities Company. During the 1980s, Rosenberger moved to another brokerage firm, Blunt, Ellis & Loewi, then moved back to B.C. Christopher Securities Company. Dye remained his client throughout the entire period.

$14,856.79 in commissions and transfer fees. Finally, Dye lost an additional $55,000 plus interest when Rosenberger borrowed that amount from Dye's margin account and failed to repay it.

Every tax year from 1984 to 1987, Dye reported capital losses on Schedule D of her federal income tax return, totaling her entire $383,423.63 in trading loss.[2] However, because I.R.C. § 1211(b) allows capital losses in a given tax year to be set off against gross income only to the extent of that tax year's realized capital gains, plus $3,000, Dye was able to set off against gross income a total of only $13,743.95 in capital losses on her 1984 through 1988 federal income tax returns.[3] As a result, at the end of 1988, Dye had a "net long-term capital loss carryover" of $369,680, as permitted by I.R.C. § 1212(b). This figure was later "corrected" to $363,680.

On July 1, 1988, Dye sued Rosenberger and his former employers under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.*, alleging securities fraud and mismanagement of her investment accounts. On February 22, 1989, Dye amended her complaint. The amended complaint alleged

---

[2]In addition, every tax year from 1985 to 1989, Dye reported investment interest expense on Schedule A of her federal income tax return, totaling almost the full $170,991.71 in interest she had paid.

[3]In tax year 1984, Dye excluded from gross income only $1,743.95, as a "net short term capital loss." In each tax year from 1985 to 1988, Dye excluded the statutory maximum of $3,000 per year as a "net long term capital loss."

- 4 -

"churning [and] unsuitable and unauthorized trading" in violation of Sections 10(b), 15(c)(1), and 20 of the Securities Exchange Act of 1934, and Rules 10b-5 and 15(c)(1)-(2) issued pursuant to that Act, as well as civil RICO violations under 18 U.S.C. §§ 1961-68, breach of fiduciary duty, negligence, common law fraud, and breach of contract regarding the unpaid $55,000 loan.

In late 1989, both of Rosenberger's former employers settled with Dye. Under the settlements, Dye received $302,500 in cash, forgiveness of her margin account debit balance of $270,405.97, and the release of some of her municipal bonds, which were being held as collateral on the margin account. The settlement proceeds were not specifically allocated by the settlement agreements to any category of claimed damages.

From the cash settlement proceeds, Dye's legal counsel withheld $207,617.37 for attorneys' fees and legal expenses. Thus, after paying her attorneys, Dye netted $365,288.60 ($94,882.63 in cash and $270,405.97 in margin account balance forgiveness), which was slightly less than the $383,423.63 in trading loss she had suffered and significantly less than her total losses.

In June 1990, Dye filed her 1989 federal income tax return, showing a total tax liability for 1989 of $5,198. On Schedule D of the tax return, Dye reported the $572,905.97 settlement proceeds from the Rosenberger suit as a long-term

capital gain.[4]  From this capital gain, Dye deducted a "net long-term capital loss carryover" from 1988 of $369,680, leaving a "net capital gain" of $203,225.97. Dye characterized the gain as a "legal settlement pertaining to mis-handling of investments--prior years."

On Schedule A of her 1989 tax return, Dye reported the $207,617.37 in attorneys' fees and expenses she incurred in the Rosenberger Suit as a miscellaneous itemized expense.  Subsequently, however, in August, 1990, Dye filed an amended 1989 return seeking to recharacterize these attorneys fees and expenses as a capital expenditure, in order to offset them against the settlement proceeds.

On December 10, 1990, the Internal Revenue Service ("IRS") notified Dye that because she had failed to compute her "alternative minimum tax" under I.R.C. § 56, Dye had underpaid her 1989 taxes by $49,470.03.  In response, on December 24, 1990, Dye filed a corrected 1989 tax return.  On this corrected return, Dye computed her alternative minimum tax, and also characterized the attorneys fees and expenses associated with the Rosenberger suit as a capital expenditure, as she had done on her amended return.

_____

[4]Dye did not include the value of the release of her bonds as part of the settlement proceeds.  Neither party to the present litigation discusses the value of the bonds, nor indicates what portion of them were released.  Apparently, both parties agree that the released bonds belonged to Dye throughout the entire period at issue, and that their release thus did not constitute income to Dye in 1989.

On October 15, 1991, Dye filed a second amended 1989 return that again characterized her attorneys' fees and expenses as capital expenditures. On April 9, 1992, the IRS disallowed Dye's two requests for a refund based on her amended 1989 return, on the grounds that the attorneys' fees and expenses associated with the "cost of recovery" of Dye's money were ordinary expenses that were properly reported on Schedule A, rather than capital expenses appropriate for reporting on Schedule D. On February 18, 1993, Dye filed a third amended 1989 return, again seeking to recharacterize the attorneys fees and expenses as a capital expenditure. On October 14, 1993, Dye paid to the IRS her current outstanding assessed 1989 federal income tax liability (including interest) of $54,442.63.[5] On October 28, 1993, the IRS disallowed Dye's third claim for refund. On August 24, 1994, Dye filed a fourth amended return, again seeking to recharacterize the attorneys' fees and expenses as a capital expenditure, and claiming a refund of $69,989.74 based on her 1989 return. On October 11, 1994, the IRS disallowed this fourth claim for refund.

On January 20, 1995, Dye sued the IRS in federal district court, seeking a refund of $69,989.74 based on her 1989 federal income tax return, plus interest,

_____

[5]Dye was assessed, and she payed, a total amount of $75,472.14 in income tax, penalty, and interest for tax year 1989. The $54,442.63 that she paid on October 14, 1993 supplemented $21,0129.51 which she had already paid prior to that date.

attorneys' fees, and costs. The district court exercised jurisdiction pursuant to 28 U.S.C. § 1346(a)(1) (1994).

In connection with Dye's lawsuit, the IRS reviewed its computation of Dye's 1989 income tax, this time treating the settlement proceeds as ordinary income rather than as a capital gain. Under this computation, the IRS increased Dye's 1989 tax liability, including penalty and interest, by $75,743.00 (i.e. from $75,472.14 to $151,215.14). The IRS concedes it is barred by the applicable statute of limitations from pursuing the additional $75,743.00 from Dye. However, it contends that this sum should be offset against any refund Dye might otherwise receive as a result of the present litigation.

In the district court, both Dye and the IRS moved for summary judgment. On December 21, 1995, the court granted summary judgment in favor of the IRS, and correspondingly denied Dye's motion. Dye v. United States, 77 A.F.T.R.2d (P-H) ¶ 96-901, 96-1 U.S. Tax Cas. (CCH) ¶ 50,130 (D. Kan. 1995). Pursuant to 28 U.S.C. § 1291 (1994), Dye now appeals.

## DISCUSSION

We review a grant of summary judgment de novo. Applied Genetics Int'l, Inc. v. First Affiliated Sec., 912 F.2d 1238, 1241 (10th Cir. 1990). We apply the same standard under Fed. R. Civ. P. 56(c) used by the district court: we determine whether any genuine issue of material fact was in dispute, and, if not, whether the

moving party was entitled to judgment as a matter of law.  Id.  When considering

a motion for summary judgment, we examine all evidence in the light most

favorable to the non-moving party.  Jones v. Unisys Corp., 54 F.3d 624, 628 (10th

Cir. 1995).

I.

A.

Whether litigation proceeds are properly characterized as "ordinary"

income" or "capital income" is governed by the "origin of the claim" test.

Woodward v. Commissioner, 397 U.S. 572, 577 (1969);  Dolese v. United States,

605 F.2d 1146, 1150-51 (10th Cir. 1979), cert. denied, 445 U.S. 961 (1980).

Under the "origin of the claim test," a court seeking to classify litigation proceeds

as either "ordinary" or "capital" income must focus on the "origin and character

of the claim. . . ."  Ransburg v. United States, 440 F.2d 1140, 1143 (10th Cir.

1971).  In particular, litigation proceeds are deemed "capital income" if "the

origin of the claim litigated is in the process of acquisition itself,"  Woodward,

397 U.S. at 577, or of disposition of property.  Baylin v. United States, 43 F.3d

1451, 1454 (Fed. Cir. 1995).  As the district court noted:

> the object of the "origin of the claim" test is to find the transaction or
> activity from which the taxable event proximately resulted, United
> States v. Gilmore, 372 U.S. 39, 47 (1963), or the event that "led to
> the tax dispute." Keller St. Dev. Co. v. Commissioner, 688 F.2d 675,
> 681 (9th Cir.1982).  The origin is determined by analyzing the facts

and determining what the nature of the transaction is. Keller, 88 F.2d at 681.

Dye, slip op. at 7-8.

In the present case, the settlement agreements did not allocate the settlement proceeds by individual claim. Id. at 3. Thus, the "origin of the claim" test requires that a court determine how the settlement should be allocated among the various claims actually settled, and the court must then determine whether the damages associated with each settled claim were stated in terms of loss in value to Dye's capital assets.

Applying the "origin of the claim" test in this way, the district court found that "[t]he amended complaint does not reflect litigation involving the process of acquiring or disposing of assets, but rather a lawsuit to compensate an investor for professional misconduct and to punish the alleged wrongdoers through the imposition of RICO treble damages or garden variety punitive damages." Id. at 9. Thus, the district court characterized the origin of these claims as non-capital. Id. The court also found, however, that "Dye measured her damages in part in terms of the loss in value of her securities account. . . ." id. at 8, and therefore could contend that "at least some of her expenses should be attributed to the process of acquisition of property, in the sense that . . . she was, in part, attempting to recoup securities wrongfully disposed of. . . ." Id. at 9.

- 10 -

A reading of the amended complaint reveals that Dye was asserting claims for impairment to her capital, as well as claims whose origin relate to lost income or claims which the law otherwise treats as claims for ordinary income. In particular, claims that would generate ordinary income include claims for: (1) lost interest on bonds;[6] (2) interest on the loans to Rosenberger; (3) lost dividends; (4) excessive margin interest charges; (5) punitive or treble damages; and (6) prejudgment interest. Claims that would generate capital income include claims for: (1) diminution in value of Dye's investments; (2) excessive commissions and transfer fees incurred in connection with securities transactions; and (3) recovery of the principal of the loan to Rosenberger.[7] Indeed, the IRS in its brief concedes the capital nature of these latter three kinds of claims.

---

[6]Although the particular bonds at issue here are tax-exempt municipal bonds, see I.R.C. § 150(a)(6), that does not change the character of the interest as ordinary income, as opposed to capital income. It merely means that there is an exemption whereby the particular ordinary income is exempt from tax.

[7]Normally, recovery of misappropriated principal would not be "income" at all, either of the "ordinary" or the "capital" variety. Where, however, as may have happened here, the misappropriated principal was already written off as a capital loss, it seems to us that the recovery would correspondingly be accounted for as a capital gain, although we leave this question open for consideration on remand.

B.

On Schedule A of her 1989 tax return, Dye reported the $207,617.37 in attorneys' fees and expenses she incurred in litigating the Rosenberger suit as a miscellaneous itemized (i.e. "ordinary") expense. Subsequently, on her corrected 1989 tax return and each of her four amended 1989 tax returns, Dye sought to recharacterize these fees and expenses as "capital" rather than "ordinary" expenses, and thereby to report them on Schedule D rather than Schedule A. The IRS disallowed this recharacterization, contending that all of these expenses were ordinary expenses.[8]

Courts have long recognized, "as a general matter, that costs incurred in the acquisition or disposition of a capital asset are to be treated as capital expenditures," Woodward v. Commissioner, 397 U.S. 572, 575 (1970), as are "costs incurred in defending or perfecting taxpayer's claim to ownership of capital assets. . . ." Spangler v. Commissioner, 323 F.2d 913, 919 (9th Cir. 1963). In a case involving securities appraisal litigation, the Woodward Court affirmed that "*legal*, brokerage, accounting, and similar costs incurred in the acquisition or

_____

[8]As a practical matter, Dye's 1989 tax return would be subject to the Alternative Minimum Tax, I.R.C. § 55-59, if her litigation expenses were reported as miscellaneous itemized deductions, but not if they were reported as capital expense. See I.R.C. § 56(b)(1)(A)(i) (disallowing deduction for miscellaneous itemized deductions when computing alternative minimum tax). The application of the Alternative Minimum Tax would significantly impact Dye's 1989 tax liability.

- 12 -

disposition of . . . property are capital expenditures." Id. at 576 (emphasis added) (citing cases). It opined that "[t]he law could hardly be otherwise, for such ancillary expenses incurred in acquiring or disposing of an asset are as much part of the cost of that asset as is the price paid for it." Id. Capital expenditures are reported on Schedule D as "capital losses," which may be set off against "capital income," also called "capital gains." I.R.C. § 1211(b)(1). Dye claims that her attorneys' fees and expenses are properly characterized as capital expenditures.

To determine whether legal fees and expenses incurred in litigation are ordinary or capital in nature, once again the "origin of the claim" test is applied. Woodward, 397 U.S. at 577; Dolese v. United States, 605 F.2d 1146, 1150-51 (10th Cir.1979), cert. denied, 445 U.S. 961 (1980); Ransburg v. United States, 440 F.2d 1140, 1143 (10th Cir. 1971); see generally Jean F. Rydstrom, Annotation, What Kinds of Legal Costs Incurred By Taxpayer Are Deductible-- Current Cases, 39 A.L.R. Fed 221 (1978 & Supp. 1995) (surveying cases). Legal expenses incurred to recover claims for ordinary income are ordinary expenses. Leonard v. Commissioner, 94 F.3d 523, 526 (9th Cir. 1996). Thus, for example, attorneys' fees paid to recover interest are ordinary expenses, id., as are attorneys'

- 13 -

fees paid to recover dividends,[9] Nickell v. Commissioner, 831 F.2d 1265, 1275

(6th Cir. 1987); see also id. at 1276 (Nelson, J., concurring in part and dissenting

in part) (agreeing with the majority that "all legal expenses allocable to the

recovery of dividends and interest" are ordinary expenses deductible under I.R.C.

§ 212), and attorneys' fees paid to obtain punitive damages.  McKeague v. United

States, 12 Cl. Ct. 671, 677 (1987), aff'd, 852 F.2d 1294 (Fed. Cir. 1988) (table).

On the other hand, "[t]he cost of defending or perfecting title to property"

is a capital expenditure, Treas. Reg. § 1.263(a)-2(c), as is the expense incurred in

recovering capital property.  Nickell, 831 F.2d at 1275; Treas. Reg. § 1.212-1(k).

As one court has explained:

> The policy behind [Treas. Reg. § 1.212-1(k)] is that expenses
> incurred in acquiring income-producing property--such as brokerage
> fees incurred in the process of acquiring stocks--are part of the cost

---

[9]In Spangler v. Commissioner, 323 F.2d 913, 919-20 (9th Cir. 1963), the
court held that attorneys' fees paid to recover dividends were capital expenditures
where "[t]he gist of the controversy between taxpayer and the managing officers
in the state court litigation was the ownership of the stock."  The Spangler court's
focus on the "gist of the controversy," and its corresponding decision not to
allocate between capital and ordinary expenses, is consistent with the approach
suggested by Dye in the present case.  However, the Spangler case was decided
before the Supreme Court's seminal decisions in Woodward v. Commissioner,
397 U.S. 572 (1970) and United States v. Hilton Hotels Corp., 397 U.S. 580
(1970), and, to the extent that it eschewed allocation, it has not been followed by
any circuit court subsequent to those decisions.  In any event, to the extent that
Spangler conflicts with our decision in Dolese v. Commissioner, 605 F.2d 1146,
1151 (10th Cir. 1979), cert. denied, 445 U.S. 961 (1980) (holding that where
litigation involves more than one claim, "[t]he origin [of the claim] test must be
applied separately to each part."), we are bound by Dolese.

of the property, and are therefore treated as non-deductible capital expenditures. These expenditures are added to the basis of the capital asset in connection with which they are incurred, and are taken into account for tax purposes either through depreciation of the asset or through reduction of the capital gain (or augmentation of the loss) when the asset is sold.

Burch v. United States, 698 F.2d 575, 577 (2d Cir. 1983) (citing Woodward, 397 U.S. at 575) (internal citations and quote marks omitted).

Here, the district court purported to apply the "origin of the claim" test to determine whether Dye's $207,617.37 in legal expenses were "capital" or "ordinary." In doing so, the court held that:

The amended complaint does not reflect litigation involving the process of acquiring or disposing of assets, but rather a lawsuit to compensate an investor for professional misconduct and to punish the alleged wrongdoers through the imposition of RICO treble damages or garden variety punitive damages. The expenses incurred in doing so are not capital in nature and are deductible, if at all, as ordinary business expenditures.

Dye, slip op. at 9.

In our view, the district court erred in treating the legal expenses as a unified whole, rather than attempting to allocate them based on their respective "origins" in *each* of Dye's legal claims. Where, as here, the litigation involves more than one claim, "[t]he origin [of the claim] test must be applied separately to each part." Dolese v. United States, 605 F.2d 1146, 1151 (10th Cir. 1979), cert. denied, 445 U.S. 961 (1980). Legal fees, like other expenses, may, under certain circumstances, be partially deductible and partially nondeductible. See,

- 15 -

e.g., Treas. Reg. § 1.212-1(k) ("Attorneys' fees paid in a suit to quiet title to lands are not deductible; but if the suit is also to collect accrued rents thereon, that portion of such fees is deductible which is properly allocable to the services rendered in collecting such rents."); see also Boagni v. Commissioner, 59 T.C. 708, 713-14 (1973) (recognizing that legal expenses incurred can be characterized as both deductible and nondeductible when the litigation is rooted in situations giving rise to both types of expenditures).  Consequently, when litigation originates in claims that are both capital and ordinary in nature, the litigation expenses should be allocated between the capital and ordinary income claims. See e.g., Burch v. United States, 698 F.2d 575, 579-80 (2d Cir. 1983) (taxpayer's legal expenses "should be apportioned between those devoted to establishing [taxpayer's] title to the trust property, which are non-deductible capital expenses, and those devoted to reducing [certain trustee] fees, at least some of which appear to have been deductible expenses for the management of income-producing property. Such an allocation between deductible and non-deductible expenses is not unusual, although a rough approximation is all that can be expected.") (footnote, citations, and interior quote marks omitted); accord Nickell v. Commissioner, 831 F.2d 1265, 1275-76 (6th Cir. 1987).

As discussed *supra* Subpart A, Dye's claims in the Rosenberger suit included more than just claims for recovery of ordinary income.  Dye also

asserted claims for recovery of capital assets. Specifically, Dye sought, *inter alia*, damages stemming from the $383,423.63 in securities trading losses she sustained, recovery of excess commissions in the amount of $14,856.79, and recovery of excess transfer fees in an unspecified amount. In addition, she sought the return of the $55,000 in principal that Rosenberger had illegally borrowed, and the return of the pledged bonds being held as collateral on Dye's margin account. These claims, which originated with the acquisition or disposition of property, were capital in nature. See Subpart A, *supra*. The expenses incurred in prosecuting them were therefore capital expenses. See Woodward, 397 U.S. at 575; Hilton Hotels, 397 U.S. at 583. The district court thus erred in holding all of Dye's litigation expenses to be ordinary expenses. Dye. slip op. at 9. Like the settlement proceeds, the litigation expenses should have been allocated between "capital" and "ordinary" expenditures, pursuant to the "origin of the claim" test.

## II.

Having held that the "origin of the claim" test requires allocation of both the settlement proceeds and the litigation expenses to their "origins" in each of Dye's claims, we must now address the issue of *how* such an allocation might be made. As the district court noted, the settlement proceeds from the Rosenberger suit were not specifically allocated by the settlement agreements to any category

of claimed damages.  <u>Dye</u>, slip op. at 3.  Further, the attorneys' fees were computed on a straight contingency basis, and the attorneys' costs and expenses were similarly undifferentiated.  <u>Id.</u>  Thus, like her settlement proceeds, Dye's legal expenditures are not easily allocated according to Dye's individual legal claims.

A.

As a threshold matter, we note that on Dye's 1989 tax return, Dye reported the entire $572,905.97 in settlement proceeds as "long-term capital income," and that, prior to the present litigation, the IRS never challenged this characterization of the proceeds.  The IRS now believes, however, that some portion of the settlement proceeds should have been characterized as "ordinary income" rather than "capital income."  The IRS concedes that it is time-barred under I.R.C. § 6501(a) from seeking any additional 1989 taxes that turn on this distinction.  Nonetheless, the IRS contends that such additional taxes should be offset against any refund Dye might receive as a result of the present lawsuit.

It has been long settled that  "the ultimate question presented for decision, upon a claim for refund, is whether the taxpayer has overpaid his tax.  This involves a redetermination of the entire tax liability.  While no new assessment can be made, after the bar of the statute [of limitations] has fallen, the taxpayer, nevertheless, is not entitled to a refund unless he has overpaid his tax."  <u>Lewis v.</u>

- 18 -

Reynolds, 284 U.S. 281, 283, modified, 284 U.S. 599 (1932) (quoting Lewis v. Reynolds, 48 F.2d 515, 516 (10th Cir. 1931)). Thus:

> While the statutes authorizing refunds do not specifically empower the Commissioner to reaudit a return whenever repayment is claimed, authority therefor is necessarily implied. An overpayment must appear before refund is authorized. Although the statute of limitations may have barred the assessment and collection of any additional sum, it does not obliterate the right of the United States to retain payments already received when they do not exceed the amount which might have been properly assessed and demanded.

Id.; see also Angle v. United States, 996 F.2d 252, 256 (10th Cir. 1993) (verifying that Lewis v. Reynolds is still good law).

In sum, I.R.C. § 6501(a) precludes the IRS from holding Dye liable for any additional 1989 taxes, beyond the $75,472.14 Dye has already paid. To receive a 1989 tax refund, however, Dye must prove that $75,472.14 "exceed[s] the amount which *might* have been properly assessed and demanded." Lewis, 284 U.S. at 283 (emphasis added). Thus, if any of Dye's settlement proceeds *should* have been characterized as ordinary rather than capital income, then nothing in I.R.C. § 6501(a) precludes the IRS from setting off Dye's time-barred but unpaid 1989 tax liability against any 1989 tax refund Dye might otherwise obtain.

We must therefore proceed to discuss the allocation of Dye's settlement proceeds and expenses into categories of "ordinary" and "capital" income. In the present case, the problem of allocation was exacerbated by the fact that, in their respective motions for summary judgment, neither Dye nor the IRS conceded that Dye's settlement proceeds and legal expenditures might be partly ordinary and partly capital. Rather, Dye contended--and still contends--that all of her settlement proceeds and all of her expenditures were capital in nature. The IRS, by contrast, contended before the district court that all of Dye's settlement proceeds and all of her expenditures were ordinary, although it now concedes otherwise.

Confronted with this stalemate, the district court held that it was Dye who shouldered the burden of allocating her settlement proceeds into capital and non-capital portions, and that Dye had failed to meet this burden. Specifically, the court found that "no evidence has been presented by Ms. Dye . . . that would support any attribution of a portion of the expenses as capital in nature." Noting that "Dye has the burden to prove she is entitled to a tax refund," Dye, slip op. at 10, the court granted summary judgment in favor of the IRS. Id.

We believe that the district court overstated Dye's evidentiary burden of production, and failed to account for the compelling evidence before it that the

IRS had acted arbitrarily in asserting that no portion of Dye's legal fees should be attributable to capital claims. We agree with the district court that in an action to recover taxes paid, the taxpayer has the burden to show not merely that the IRS's assessment was erroneous, but also the amount of the refund to which the taxpayer is entitled.[10] See United States v. Janis, 428 U.S. 433, 440 (1976) ("In a refund suit the taxpayer bears the burden of proving the amount he is entitled to recover. It is not enough for him to demonstrate that the assessment of the tax for which refund is sought is erroneous in some respects.") (citing Lewis v. Reynolds, 284 U.S. 281 (1932)); accord Helvering v. Taylor, 293 U.S. 507, 514 (1935); cf. Interstate Transit Lines v. Commissioner, 319 U.S. 590, 593 (1943) ("[A]n income tax deduction is a matter of legislative grace and . . . the burden of clearly showing the right to the claimed deduction is on the taxpayer."). As one

---

[10]When the suit is brought by the IRS to collect a deficiency, the burden of proof changes somewhat. In that context, if the taxpayer proves that the IRS assessment is arbitrary and unsupportable, the burden then shifts back to the IRS to prove what the correct amount of tax should be. United States v. Janis, 428 U.S. 433, 441-42 & n.8 (1976); Helvering v. Taylor, 293 U.S. 507, 515 (1935); see also Cebollero v. Commissioner, 967 F.2d 986, 990 (4th Cir. 1992) (surveying circuit court cases). However, as noted above, the procedural posture of the present case is a taxpayer suit for a refund, and not an IRS suit for deficiency. See generally Portillo v. Commissioner, 932 F.2d 1128, 1133 (5th Cir. 1991) ("In a Tax court deficiency proceeding, . . . once the taxpayer has established that the assessment is arbitrary and erroneous, the burden shifts to the government to prove the correct amount of any taxes owed. In a refund suit, on the other hand, the taxpayer bears the burden of proving both the excessiveness of the assessment and the correct amount of any refund to which he is entitled.") (citing cases).

court has explained, a taxpayer filing a tax refund case "bears the burdens both of production and of persuasion." Ruth v. United States, 823 F.2d 1091, 1093 (7th Cir. 1987) (citing Janis, 428 U.S. at 440).

Thus, in order to prevail, Dye must prove not only the incorrectness of the IRS's determination, but also the correct amount that she is entitled to recover. The difficulty in the present case, however, is that Dye's claims were denied at the summary judgment stage. Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. 10A Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2727, at 121 & n.1 (2d ed. 1983) (citing SMS Mfg. Co. v. U. S.-Mengel Plywoods, Inc., 219 F.2d 606, 608 (10th Cir. 1955) and other cases). Although the burden of production may be shifted to the non-moving party, see Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986), cert. denied after remand, 484 U.S. 1066 (1988), the ultimate burden of persuading the court that there are no genuine issues of material fact always remains on the moving party. See id. at 323; accord id. at 330 (Brennan, J., dissenting).

Thus, in the present context, Dye, the non-movant for summary judgment, bears only the burden of production. On the issue of whether any genuine issues

of material fact remain disputed, however, it is the IRS which bears the burden of persuasion. After the summary judgment stage, on the ultimate issue of whether Dye is entitled to a tax refund, the burden of persuasion reverts to Dye.

Applying these principles to the present case, we note that the district court was faced with two motions for summary judgment, both of which were based on erroneous legal theories. See Part I, *supra*. In conjunction with these motions, Dye presented evidence that several of her claims against Rosenberger were capital in origin. She also presented evidence pertaining to the value of these capital claims,[11] as well as the value of some of her non-capital claims.[12] On that record, the IRS's motion, premised on the theory that *none* of Dye's settlement proceeds or litigation expenses were capital in nature, was arbitrary and insufficient to support summary judgment.

It is true that Dye did not present evidence pertaining to the value of *all* of her settled claims.[13] However, most of the claims which Dye did not specifically valuate merely stated alternative legal bases for awarding the same damages

---

[11]E.g., the $383,423.63 in trading losses, the $14,856.79 in excess commissions, and recovery of the $55,000 principal on the unpaid loan.

[12]E.g., the $229,558 in lost interest on the tax-free municipal bonds and the $170,991.71 in margin interest.

[13]E.g., Dye's claims for breach of fiduciary duty, negligence, and common law fraud, her civil RICO claims, her requests for punitive and treble damages, and her claim for excessive transfer fees.

specifically valued in Dye's principal claims.[14]  As several courts have noted, the relevant inquiry "is not whether the action was one in tort or contract but rather the question to be asked is 'In lieu of what were the damages awarded?'" Alexander v. IRS, 72 F.3d 938, 942 (1st Cir. 1995) (quoting Raytheon Production Corp. v. Commissioner, 144 F.2d 110, 113 (1st Cir.), cert. denied, 323 U.S. 779 (1944)); accord Getty v. Commissioner, 913 F.2d 1486, 1490 (9th Cir. 1990). Simply stated, the relevant issue is not the *name* of the claim, but rather the *origin* of the claim.  See Woodward, 397 U.S. at 577.

Here, apparently Dye's settlement was partly in lieu of her claims for $383,423.63 in trading losses, $14,856.79 in excess commissions, and $55,000 in unpaid principal.  As the IRS now concedes, damages attributable to these claims are capital in origin.  Dye's settlement apparently was also partly in lieu of her $229,558 claim for lost interest on *tax-free* municipal bonds, which, even though tax free, is still considered ordinary income for present purposes--or at least it would not be considered capital income.  Cf. Roemer v. Commissioner, 716 F.2d 693, 700 (9th Cir. 1983) (distinguishing between "ordinary" tax-exempt income and "capital" tax -exempt income for purposes of allocating recovery expenses).

---

[14]To the extent that the settlement covered, for example, Dye's $383,423.63 trading losses, such recovery was "capital income" to Dye regardless of whether it was in settlement of her federal securities claim or of her common law negligence claim.

Similarly, the settlement of Dye's claim for $170,991.71 in margin interest would represent a claim for ordinary income, as would any settlement proceeds originating in any of Dye's other claims.[15]  Thus, in the Rosenberger suit, Dye claimed at least $853,973.74 in damages, of which $453,280.42[16] were capital in origin, and $229,558 were tax-exempt in origin.  Correspondingly, only $170,991.71 of Dye's claimed losses, plus any punitive or treble damages Dye may have received, have their origin in the loss of Dye's ordinary income.

Under these circumstances, Dye has presented evidence adequate to overthrow the IRS's assessment, and to establish that there is a genuine issue of material fact as to what proportion of the settlement proceeds were ordinary income and what proportion were capital income.  Indeed, if all inferences are drawn in favor of Dye, the non-movant for summary judgment, the aforementioned evidence *is* sufficient to permit calculation of the correct amount of tax that is due, using at least one acceptable method of calculation.  See

[15] To the extent, however, that Dye claimed punitive or treble damages, we note both that her total settlement was for significantly less money than her actual losses, and that the settling defendants admitted no wrongdoing.  At the summary judgment stage, these two facts support an inference that Dye received no punitive or treble damages.  On remand, the district court must determine whether any portion of the settlement should properly be allocated to punitive or treble damages.

[16]$383,423.63 in trading losses plus $14,856.79 in excess commissions plus $55,000 in unpaid principal.  This figure does not include any damages attributable to excessive transfer fees, which would be capital in origin but which Dye did not valuate in her complaint in the Rosenberger suit.

Delaney v. Commissioner, 99 F.3d 20, 25 (1st Cir. 1996) (approving Tax Court's allocation of settlement proceeds based on percentage of damages represented by each element in jury award) (citing Robinson v. Commissioner, 70 F.3d 34, 38 (5th Cir.1995), cert. denied, 117 S. Ct. 83 (1996)); see generally Commissioner v. Miller, 914 F.2d 586, 592 (4th Cir. 1990), aff'd after remand, 60 F.3d 823 (4th Cir. 1995) (table) (discussing "a myriad of ways" in which litigation proceeds which were not allocated by the parties might be allocated by the tax court).

Accordingly, we hold that the district court erred in granting summary judgment in favor of the IRS. The parties should have been allowed to proceed until the court was able to resolve the ambiguities in the record regarding the respective percentages of the settlement which were "capital" and "ordinary," and to allocate the settlement proceeds based on its findings.

C.

The problem of how to allocate Dye's attorneys' fees and legal expenses between capital expenditures and ordinary nonbusiness profit making expenses is perhaps more difficult than the problem of how to allocate Dye's settlement proceeds between ordinary and capital income. While, as discussed *supra*, Dye's settlement proceeds may be (roughly) allocated in proportion to the categories of

damages claimed by Dye, the relevance of the categories of damages claimed to the allocation of Dye's legal expenditures is subject to debate.

Notably, at least one appellate court has held that, under the "origin of the claim" test, the tax treatment of legal expenditures should not necessarily be based on the relative amounts of capital and ordinary income ultimately received. Baylin v. United States, 43 F.3d 1451, 1453 (Fed. Cir. 1995). Rather, under the Baylin court's approach, legal expenditures should be allocated according to the approximate proportion of the lawyers' efforts attributable to the pursuit of each claim. See id. at 1454. Thus, in Baylin, the court rejected as an "unsupported assumption" a taxpayer's attribution of half of his legal fees to "collection of income," despite the facts that: (1) half of the recovery was ordinary income; and (2) half of the legal fees were paid out of that recovery. Id. The Baylin court predicated its rejection on the fact that "the evidence presented on the attorney's allocation of his time suggests that he spent a *de minimis* amount attempting to increase the [ordinary income] portion of the award." Id.

Another appellate court, by contrast, has rejected an approach similar to that of the Baylin court, "because it ignores the contingent fee portion of the taxpayers' contract with their lawyers, and allocates fees only on the basis of the hourly rate portion of the contract." Leonard v. Commissioner, 94 F.3d 523, 526 (9th Cir. 1996). Under the Leonard court's approach, "taxpayers are entitled to

deduct what they actually paid their lawyers, according to the contingent fee contract, to obtain their share of [each] portion of the [litigation proceeds]." Id. In the case at bar, where Dye contracted with her attorneys solely on a contingent fee basis, the Leonard approach would mandate that Dye's litigation expenses be allocated in proportion to the relative amounts of capital and ordinary income she ultimately received.[17]

In the present context, we decline to choose a side in this debate. Rather, we note that under *any* method of allocation, it is clear that some of Dye's legal expenses originated in capital claims, as the IRS now concedes. Thus, we merely hold that Dye's legal expenses should have been allocated, in some rough or approximate way, between her "capital" and "ordinary" claims. Whether this allocation might best have been made according to the proportion of Dye's lawyers' efforts dedicated to pursuing each category of claims (the Baylin approach), or simply according to the proportion of the settlement proceeds representing each category of claims, or any other reasonable way (the Leonard approach), is not before us now.

_____

[17]Indeed, in a straight contingent fee case, where lawyers are unlikely to have maintained accurate hourly work-logs, the proportional recovery of each type of income might often be the *only* objective criteria available to a court engaged in the difficult task of allocating legal expenses according to the "origin and character of the claim." Cf. Burch v. United States, 698 F.2d 575, 580 (2d Cir. 1983) ("a rough approximation is all that can be expected").

**CONCLUSION**

We REVERSE the district court's grant of summary judgment in favor of the IRS, and REMAND for further proceedings not inconsistent with this opinion. Upon remand, the district court should allocate Dye's $207,617.37 in legal expenses between ordinary and capital expenses. At the IRS's request, the court should also allocate Dye's $572,905.97 in settlement proceeds between ordinary and capital income, for purposes of establishing a set off to any refund that may be awarded to Dye.