In re William S. EDWARDS, Darinda J. Edwards, and Donald W. Edwards, Plaintiffs–Appellants,

v.

FIRST NATIONAL BANK, BARTLESVILLE, OKLAHOMA, a National Bank; Federal Deposit Insurance Corporation, as Liquidating Agent for Fairview State Bank and in its separate corporate capacity; Paul Brown; Bill D. Wilson; and Robert Graalman, Defendants–Appellees.

No. 87–1436.

United States Court of Appeals, Tenth Circuit.

April 11, 1989.

Terry Guy Shipley, Noble, Okl. (Philip W. Redwine of Redwine and Kappel, Norman, Okl., with him on the brief), for plaintiffs-appellants.

Harry A. Woods, Jr. (Mark S. Edmondson of Crowe & Dunlevy, with him on the brief), Oklahoma City, Okl., for Paul Brown, defendant-appellee.

(James Mullen of Brewer, Worten, Robinette, Johnson, Worten & King, on the brief), Bartlesville, Okl., for First Nat. Bank, Bartlesville, Okl.

(Steven P. Shreder of Edwards, Roberts & Propester, on the brief), Oklahoma City, Okl., for Federal Deposit Ins. Corp. as Receiver for Fairview State Bank.

Before MOORE, BALDOCK, and McWILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

William Edwards, his brother, Donald Edwards, and William's wife, Darinda Edwards, brought the present action under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, naming as defendants the First National Bank, Bartlesville, Oklahoma, one of its officers, Paul Brown, and the Fairview State Bank, Fairview, Oklahoma, and two of its officers, Bill Wilson and Robert Graalman. In a second count, plaintiffs asserted a pendent cause of action based on intentional tort. Extensive discovery ensued. The defendants then filed motions for summary judgment, which motions were granted. Plaintiffs appeal the adverse judgments thus suffered. We affirm.

The background facts out of which the present controversy arose are not seriously

disputed. William and Donald Edwards have conducted a cattle operation on their ranch near Fairview, Oklahoma (population 3,370), since the early 1970's. In 1980, the two had an opportunity to purchase an entire herd of registered and certified Brangus cattle. Needing money to buy the herd, the brothers went to the Fairview State Bank and discussed the possibility of a loan with one of its officers, Bill Wilson. Wilson advised the Edwards brothers that a loan could probably be made, but that because of banking regulations which placed limits on the size of loans the First National Bank, Bartlesville, Oklahoma, would participate in the loan. The brothers were also advised that, due to regulations, the initial loan would be for only a short time, but that the loan could later be extended. The brothers, in turn, advised Bill Wilson that it would take at least five years to develop the Brangus herd into a profitable operation. During this development phase, it was understood that the Edwards could only pay interest.

Bill Wilson, representing Fairview State Bank, and Paul Brown, an officer of First National Bank, later inspected the herd, and a loan to the Edwards brothers was made by Fairview State, with First National participating in the loan. From time to time during 1981 and 1982 portions of the herd were sold with the proceeds being applied on the loan.

The facts which form the basis for plaintiffs' RICO claims are as follows:

1. On March 2, 1983, the Edwards were having a sale of some of the cattle from the Brangus herd, as well as the sale of cattle belonging to third parties. On prior sales of this type, the proceeds of the sale were delivered to Bill Wilson at the Fairview State Bank on the day after the sale. This practice was performed with Wilson's consent. However, on this particular occasion, Paul Brown of the First National Bank appeared at the scene of the sale and advised William Edwards that he should take the proceeds to Fairview State Bank immediately after the sale, and that if he didn't, "he was going to jail." William Edwards complied with that instruction.

2. On the next day, March 3, 1983, all three plaintiffs went to Wilson's offices at the Fairview State Bank to allocate the proceeds of the previous day's sales. On that occasion, Paul Brown was also present, and said that if First National's participation was not fully paid at once, Donald and William Edwards, and Bill Wilson would all go to jail. After this "threat," the Edwards brothers were asked to call their father, Floyd Edwards, and ask for assistance. The Edwards declined to call their father.

3. However, Robert Graalman, President of Fairview State Bank did call Floyd Edwards, who came immediately. At that time, Brown again said he would put the Edwards brothers and Bill Wilson in jail if First National was not paid at once. Floyd Edwards, the father, inquired of Graalman as to what it would take to get "rid" of Brown. Graalman indicated Floyd Edwards' note for $220,000, which was the unpaid amount of First National's participation, would get "rid" of Brown and First National. Floyd Edwards signed a note for $220,000, and the note and a cashier's check in that same amount were placed in Fairview's safe. From that time on Brown had no further dealings with any of the plaintiffs.

4. In 1982, an "operating loan" in a sum of approximately $65,000 was made by Fairview State Bank to Darinda Edwards. This loan was unsecured. In October, 1983, Wilson told William Edwards that the bank needed some collateral on that note. When William Edwards told Bill Wilson that there was no available collateral, Bill Wilson replied that he would "hate to see Darinda go to jail." Collateral was then forthcoming.

5. In December, 1987, Earl Hall, the newly appointed president of Fairview State Bank, told William and Darinda Edwards that the operating loan was "illegal" and that the note should be paid at once. Shortly thereafter, the three plaintiffs filed for Chapter 11 reorganization under the Bankruptcy Code.

After discovery, all defendants, i.e., both banks and the three individual defendants,

filed motions for summary judgment, contending that there was no genuine issue of any material fact. Their argument was that the pleadings and depositions demonstrated that there was no "pattern of racketeering activity," and that even if there were, the plaintiffs' action was time barred by the applicable statute of limitations. The district court held that there were genuine issues of fact concerning the statute of limitations. However, the court concluded that the record before it showed that there was no "pattern" of racketeering activities by the defendants, and on that ground entered summary judgment for the defendants on that part of the plaintiffs' claim based on 18 U.S.C. § 1962(c). Having failed to show a claim under 1962(c), the district court held that the plaintiffs also failed on their conspiracy claim based on 18 U.S.C. § 1962(d). Similarly, once the federal RICO claims were dismissed, the district court refused to exercise pendent jurisdiction and dismissed plaintiffs' state claim.

At the outset we should scrutinize the claims of the several plaintiffs and distinguish each. William and Donald Edwards base RICO claims on the events of March 2 and 3, 1983, when Paul Brown threatened them with jail. Since she was not threatened on either occasion, Darinda Edwards has no RICO claim on the basis of Paul Brown's statements on March 2 and 3. Moreover, Bill Wilson made no threatening statements to either William or Donald Edwards on either March 2 or 3. Indeed, on March 3, Bill Wilson was himself threatened with jail by Paul Brown. Consequently, based on the events of March 2 and 3, William and Donald Edwards, but not Darinda, assert a RICO claim against Paul Brown and the First National Bank. However, based on the events of March 2 and 3, the Edwards brothers have no RICO claim against Bill Wilson.

William Edwards apparently asserts a RICO claim based on an incident which occurred in October, 1983, when Bill Wilson reportedly stated that he would hate to see Darinda Edwards "go to jail" over the unsecured note she had signed. Neither Darinda Edwards nor Donald Edwards was present when this statement was made. Accordingly, Donald Edwards does not have a RICO claim against Bill Wilson based on his statement to William Edwards concerning Darinda Edwards and the unsecured note she had signed. Similarly, it is doubtful whether Darinda Edwards has a RICO claim based on this incident.

Neither William nor Darinda Edwards bases a RICO claim on Earl Hall's statement to them in December, 1983, that the operating loan to Darinda Edwards was "illegal."

Once the facts and the parties have been sorted out, the claims are easily summarized. Based on the events of March 2 and 3, 1983, William and Donald Edwards, but not Darinda Edwards, assert a RICO claim against Paul Brown and First National Bank, but not against Bill Wilson, Robert Graalman or Fairview State Bank. William Edwards, and possibly Darinda Edwards, but not Donald Edwards, assert a RICO claim against Bill Wilson and Fairview State Bank, but not against Paul Brown or the First National Bank, based on Bill Wilson's statement in October, 1983, that he would hate to see Darinda "go to jail" over the unsecured note she had signed in return for an operating loan. When viewed in this light, plaintiffs' RICO claims tend to pale.

18 U.S.C. § 1962(c) reads as follows:

§ 1962 Prohibited activities

. . . .

(c) It shall be unlawful for any *person* employed by or associated with any *enterprise* engaged in, or the activities of which affect, interstate or foreign commerce, *to conduct* or participate, directly or indirectly, in the conduct of *such enterprise's affairs through a pattern of racketeering activity* or collection of unlawful debt (emphasis added).

The gist of the complaint is that the defendants formed an "enterprise" which engaged in or conducted activities which affected interstate commerce and that they conducted the enterprise's affairs through a "pattern of racketeering activity" which damaged the plaintiffs. For this injury

plaintiffs sought treble damages under 18 U.S.C. § 1964(c) in a total sum of $18,000,-000.00. It was plaintiffs' position that the threats of certain of the defendants to jail the plaintiffs if their debt was not repaid at once was extortion under the Extortionate Credit Transactions Act, 18 U.S.C. §§ 891–896, as well as under local Oklahoma statutory law, and that such conduct was within the statutory definition of "racketeering activity" set forth in 18 U.S.C. § 1961.

As indicated, the defendants moved for summary judgment on several grounds: (1) The RICO claim was time barred; (2) there was no "enterprise" or "racketeering activity" within the meaning of 18 U.S.C. § 1962(c); and (3) if there was any "racketeering activity," there was no "pattern," only isolated acts. As indicated, the district court held that there was a genuine issue of material fact on the statute of limitations issue. The defendants do not reassert that matter in this court. The district court also held that there was no "pattern" of racketeering activity by the defendants, and on this basis granted summary judgment.

Since the district court found no "pattern," it did not address the other grounds advanced by the defendants, i.e., no "enterprise" and no "racketeering activity." On appeal, the defendants suggest that the district court was correct in finding no "pattern," but argue that even if we should find that a pattern existed, we should nonetheless affirm the district court on the grounds that there was no "enterprise" formed by the defendants, and that in fact there was no "racketeering activity" by the defendants. In this latter connection the defendants argue that to threaten one with jail over an unpaid debt is not the type of "violence" contemplated by the Extortionate Credit Transactions Act or RICO. Our approach to this case will be similar to the district court's and we will consider first the issue of "pattern," vis-a-vis, isolated acts.

We will assume, though not decide, that Brown committed "racketeering activity" on March 2 and 3, 1983, when he threatened William and Donald Edwards with jail, and that Bill Wilson also committed "racketeering activity" in October, 1983, when he advised William Edwards that he would "hate" to see Darinda Edwards go to jail over her unsecured note to Fairview State Bank. The issue before us is whether there is a genuine issue regarding the existence of a "pattern" of such activity as required by 18 U.S.C. § 1962(c).

The Supreme Court in *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1986), fn. 14, discussed the "pattern" requirement as follows:

As many commentators have pointed out, the definition of a "pattern of racketeering activity" differs from the other provisions in § 1961 in that it states that a pattern *"requires* at least two acts of racketeering activity," § 1961(5) (emphasis added), not that it "means" two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." S.Rep. No. 91–617, p. 158 (1969) (emphasis added). Similarly, the sponsor of the Senate bill, after quoting this portion of the Report, pointed out to his colleagues that "[t]he term 'pattern' itself requires the showing of a relationship.... So, therefore, proof of two acts of racketeering activity, without more, does not establish a pattern...." 116 Cong.Rec. 18940 (1970) (statement of Sen. McClellan). See also *id.,* at 35193 (statement of Rep. Poff) (RICO "not aimed at the isolated offender"); House Hearings, at 665. Significantly, in defining "pattern" in a later provision of the same bill, Congress was more enlightening: "[C]riminal conduct forms a pattern

if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 18 U.S.C. § 3575(e). This language may be useful in interpreting other sections of the Act. Cf. *Iannelli v. United States*, 420 U.S. 770, 789 [95 S.Ct. 1284, 1295, 43 L.Ed.2d 616] (1975).

In *Torwest DBC, Inc. v. Dick*, 810 F.2d 925 (10th Cir.1987), we considered the "pattern" issue, but declined to formulate a "bright-line test in the abstract" as to what constitutes a "pattern," indicating that the facts of each case are determinative.

*Torwest*, however, sheds considerable light on our present problem. In *Torwest*, two corporations, Vace and Great–West, formed a new corporation, Torwest, which would engage in the business of acquiring and developing real property. Great–West was to provide the financing for Torwest, and Vace was to find new properties for acquisition by Torwest. Thereafter the individual incorporators of Vace acquired realty in the name of a "dummy" corporation and proceeded to sell the land to Torwest at an inflated price. When Torwest discovered the scheme, it brought suit against the individual incorporators of Vace, and their nominee corporation, Canusa Investments. Torwest asserted a RICO claim under the provisions of 18 U.S.C. § 1962(c), as well as pendent claims based on state law. The United States District Court for the District of Colorado dismissed Torwest's complaint under Rule 56, holding that allegations that directors of Vace secretly purchased realty and resold it at a substantial profit to Torwest did not allege the pattern of racketeering required to state a claim under 1962(c) since there was only one scheme, one result, one set of participants, one victim, one method of commission, and thus, no continuity and no pattern of racketeering activity. *Torwest DBC, Inc. v. Dick, et al.*, 628 F.Supp. 163, 165–66 (D.Colo.1986).

On appeal, we affirmed the judgment entered by the district court in *Torwest.*

*Torwest DBC, Inc. v. Dick, et al.*, 810 F.2d 925 (10th Cir.1987). In so doing, we commented as follows:

In this case, the court and the parties assumed for purposes of the court's ruling that defendants engaged in numerous racketeering acts. It is clear that when, as here, the acts are part of a common fraudulent scheme, they satisfy the relationship requirement of *Sedima.* See, e.g., *Superior Oil Co. v. Fulmer*, 785 F.2d 252 (8th Cir.1986). However, to establish a RICO pattern, a plaintiff must also demonstrate continuity, that is, "the threat of continuing activity." *Sedima*, 105 S.Ct. at 3285 n. 14. This element is derived from RICO's legislative history, which indicates that RICO does not apply to "sporadic activity" or to the "isolated offender." *Id.*

The continuity requirement has been the source of considerable difficulty. Courts generally agree that to make an adequte showing of continuity under *Sedima*, a plaintiff must demonstrate some facts from which at least a threat of ongoing illegal conduct may be inferred. A scheme to achieve a single discrete objective does not in and of itself create a threat of ongoing activity, even when that goal is pursued by multiple illegal acts, because the scheme ends when the purpose is accomplished. Courts that have considered a RICO claim grounded on this type of scheme have therefore required some additional evidence showing that the scheme was not an isolated occurrence. See, e.g., *Lipin Enters. Inc. v. Lee*, 803 F.2d 322, 324 (7th Cir.1986) (acts to defraud one victim one time insufficient in absence of showing of other victims or other frauds). A more difficult question is presented when the RICO claim is based on one scheme involving one victim, but the plan contemplates open-ended fraudulent activity and does not have a single goal that, when achieved, will bring the activity to an end. Some courts have found that such an ongoing scheme is itself sufficient to satisfy the continuity element of a RICO pattern. See, e.g., *Morgan v. Bank of Waukegan*, 804 F.2d 970, 976

(7th Cir.1986); *see also Illinois Dept. of Revenue v. Phillips,* 771 F.2d 312 (7th Cir.1985). Other courts may require additional proof showing that the defendants have engaged in similar activity in the past, or have been involved in other criminal activity, or pose a threat of similar activity in the future. *See, e.g., Superior Oil Co.,* 785 F.2d at 257.

*Id.* at 928 (footnote omitted).

Similarly, in *Condict v. Condict,* 815 F.2d 579 (10th Cir.1987), we held that a family dispute over a family ranching operation amounted, at most, to a garden variety fraud case, and did not fit the RICO mold entitling the injured party to treble damages. Our reasoning was that the facts did not meet the "continuity requirement" commented on in *Torwest* or the "conduct of an enterprise through a pattern of racketeering activity" requirement of 18 U.S.C. § 1962(c) discussed in footnote 14 in *Sedima.*

■ Based on our understanding of *Sedima* and our pronouncements in *Torwest* and *Condict,* we do not believe that there is a genuine issue concerning the pattern requirement of 18 U.S.C. § 1962(c). Certainly Brown's statements on March 2 and 3, 1983, do not themselves establish a pattern. Similarly, Bill Wilson's statement made in October, 1983, does not meet the test. Plaintiffs' reliance on a statement made in the summer of 1983 by another employee of Fairview State Bank to a different borrower of the bank that he would go to jail if he didn't repay his debt is misplaced. Such a statement would have no relation to the statements attributed to Paul Brown made some months prior thereto. In addition, such a statement would be insufficient to cause Bill Wilson's statement of October, 1983, to rise to a RICO claim. As the Supreme Court noted in *Sedima,* proof of two acts, without more, does not a pattern make.

■ Plaintiffs also asserted a conspiracy claim based on 18 U.S.C. § 1962(d). Here, as in *Torwest,* 810 F.2d at 927, n. 2, and *Condict,* 815 F.2d at 582, the conspiracy claim falls when the substantive claim based on 1962(c) is deficient. *See also,*

*Grider v. Texas Oil & Gas Corp.,* 868 F.2d 1147 (10th Cir.1989).

■ There was no abuse of discretion when the district court, after granting the defendants' motions for summary judgment on plaintiffs' RICO claims, dismissed the plaintiffs' pendent state claim based on intentional tort. *See Pitts v. Turner and Boisseau, Chartered,* 850 F.2d 650, 653 (10th Cir.1988); *Key Financial Planning Corp. v. ITT Life Ins. Corp.,* 828 F.2d 635, 643 (10th Cir.1987); *Curtis Ambulance v. Shawnee City Board of Commissioners,* 811 F.2d 1371, 1386 (10th Cir.1987) (listing factors to be considered).

By disposing of this case on the basis that the "pattern" requirement of the statute has not been met, it should not be inferred that the other requirements of the statute have been met.

Judgments affirmed.