**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 18 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

_____

BANCOKLAHOMA MORTGAGE CORP.

Plaintiff-Appellant,

v.

No. 97-5186

CAPITAL TITLE COMPANY, INC.;
INVESTORS TITLE COMPANY;
OLD REPUBLIC TITLE COMPANY
OF ST. LOUIS; U.S. TITLE GUARANTY
COMPANY, INC.; PETER M. SHAW;
and U.S. TITLE GUARANTY
COMPANY OF ST. CHARLES, INC.,

Defendants-Appellees,

JOSEPH A. IADEVITO; THERESA M.
JANSON; LENDERS MORTGAGE
SERVICES, INC.; PROFESSIONAL
BUILDERS CLOSING SERVICE, INC.,

Defendants.

_____

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 94-C-847-H)**

_____

R. Thomas Seymour, of R. Thomas Seymour Attorneys, Tulsa, Oklahoma (C. Robert Burton IV, F. Randolph Lynn, of R. Thomas Seymour Attorneys, Tulsa, Oklahoma; Frederic Dorwart, J. Michael Medina, of Law Offices of Frederic Dorwart, Tulsa, Oklahoma, with him on the brief) for Plaintiff-Appellant.

John Henry Rule, of Gable, Gotwals, Mock, Schwabe, Kihle, Gaberino, Tulsa, Oklahoma (L. K. Smith, Paul J. Cleary, Scott R. Rowland, of Boone, Smith, Davis, Hurst & Dickman, Tulsa, Oklahoma; Robert J. Bartz, Joe M. Fears, of Barber & Bartz, Tulsa, Oklahoma; Jeffrey J. Kalinowski, Hal Goldsmith, of Peper, Martin, Jensen, Maichel & Hetlage, St. Louis, Missouri, with him on the brief) for Defendants-Appellees.

_____

Before **BRORBY** and **MURPHY**, Circuit Judges, and **MARTEN**, District Judge[*].

_____

**MARTEN**, District Judge.

_____

## Background

Bancoklahoma Mortgage Corp. ("BOMC") is an Oklahoma corporation that purchases residential mortgage loans and resells them on the secondary market while retaining certain loan servicing rights. Lenders Mortgage Services, Inc. ("LMS") was a Missouri corporation that originated residential mortgage loans, primarily in the St. Louis, Missouri area, for sale to mortgage loan companies and other upstream investors,

_____

[*]The Honorable J. Thomas Marten, United States District Judge for the District of Kansas, sitting by designation.

including BOMC.  Joseph Iadevito was  LMS's chief executive officer, director, and majority shareholder.  Professional Builder's Closing Services, Inc. ("PBCS") was a Missouri corporation whose business included preparing loan closing documents and conducting real estate loan closings for LMS.  Theresa Janson, Iadevito's wife, was the president and sole shareholder of PBCS.  Capital Title Company, Inc., Investors Title Company, Old Republic Title Company of St. Louis, U.S. Title Guaranty Company, Inc., and U.S. Title Guaranty Company of St. Charles, Inc. are five of the various title companies that provided services on LMS loans purchased by BOMC.  The title companies are licensed by the state of Missouri and are engaged in the business of providing title insurance and related services.   Peter Shaw, one of the named defendants, is the principal owner of Capital Title Company, Inc.  Unless specific reference is necessary, all defendants will be referred to collectively as "the Title Companies."[1]

In April 1993, BOMC entered into an agreement to purchase home mortgage loans from LMS.  The purchase agreement, which BOMC drafted, provided that LMS would originate, close and deliver residential mortgages to BOMC.  It did not mention the use of Title Companies to close loans or handle funds.  It did, however, require LMS to include a final title policy insuring BOMC's first lien interest in its final loan documentation to BOMC.  The agreement prohibited LMS from delegating any of its duties without

_____

[1]In the proceedings below, Judge Holmes granted BOMC's motion to dismiss Iadevito and Janson with prejudice.  Therefore, any reference in this opinion to "the defendants" does not include them.

BOMC's prior written consent.   The Title Companies took no part in establishing LMS and BOMC's relationship.

Between May 1993 and March 1994, BOMC purchased approximately 700 loans from LMS, totaling $60-70 million.  Of those, 347 were "refinance" loans, i.e., homeowners were refinancing their existing home loans.[2]   LMS ceased doing business in March 1994 when forced into involuntary bankruptcy.   BOMC then discovered that the prior mortgages on 42 of the 347 refinance loans had not been paid, leaving the homeowners with two mortgages--their prior mortgage and BOMC's.  BOMC paid off the prior mortgages on those 42 loans at a cost of approximately $5.2 million, and took an assignment of the homeowners' claims.

On the refinance loans at issue, LMS closed and dispersed the funds.[3]  BOMC would wire the funds for a loan to LMS's general operating account before closing occurred and before it received any closing documents from LMS.

The Title Companies followed a standard procedure in providing title insurance. First, LMS ordered title insurance.  Second, borrowers completed "closing affidavits" or "lien affidavits," which asked a series of questions regarding the borrowers'

---

[2]Some of the loans BOMC purchased were "purchase" loans in which a borrower/buyer purchased a home from a third-party seller.  None of the "purchase" loans are at issue in this case.

[3]Notwithstanding the purchase agreement's silence on this point, the Title Companies did close loans and handle funds on the purchase loan transactions.   No one suffered any losses as a result of these transactions.

backgrounds.[4]   Third, the title company examined the title to the property being refinanced to discover any liens on the property and to issue a title commitment to LMS, obligating the title company to issue a final title policy if the first mortgage on the property was paid.[5]   Fourth, after LMS closed the loan, it sent documents to the title company to be filed to establish a first lien.  Finally, if the first mortgage on the property was paid, the title company issued a final title policy in the name of the investor purchasing the loan.

BOMC relies largely on the closing documents it  received on the refinance loans at issue, specifically the HUD-1 forms, to make its case.   When the transactions at issue took place, the Real Estate Settlement Procedures Act (RESPA) [12 U.S.C. §§ 2601-2617 (1989 & Supp. 1999)],  required the completion of a HUD-1 form for every settlement "involving a federally-related mortgage loan"  24 C.F.R. § 3500.8(a) (1993).[6]   HUD-1 forms provide a detailed account of the disbursements of money borrowers are to receive. The largest disbursement typically is the payoff of the prior mortgage on the property.

---

[4]The Title Companies provided these blank affidavits to LMS for its borrowers' use.  Borrowers provided all of the information in the affidavits to assist the Title Companies' title searches.

[5]The Title Companies received a fee of $150-200 for that service.

[6]This regulation has since been amended.  RESPA now requires a HUD-1 form in "every settlement involving a federally related mortgage loan in which there is a borrower and a seller.  For transactions in which there is a borrower and no seller, such as refinance loans or subordinate lien loans, the HUD-1 may be utilized by using the borrower's side of the HUD-1 statement."  24 C.F.R. § 3500.8(a) (1999) (emphasis added).

RESPA requires that "settlement agents" prepare HUD-1 forms. 24 C.F.R. pt. 3500 app. A (1999). At the time these transactions took place, 24 C.F.R. § 3500.2(a)(15) (1993) defined a "settlement agent" as "the person conducting or handling the settlement. If no other person is designated by the lender or other parties to the settlement, the lender shall be considered to be the settlement agent." "Settlement Agent" is no longer a defined term under 24 C.F.R. §3500.2; rather, the regulation speaks of "settlement (or "closing" or "escrow") services." Id. § 3500.2(b) (1999). The HUD-1 forms on the 42 loans at issue represented that the title company named had acted as settlement agent and either had disbursed or would disburse BOMC's money to pay off all items shown, including the prior mortgage. In fact, LMS served as settlement agent and closed all of the loans at issue. The Title Companies did not prepare the HUD-1 forms.

In addition to its targeting of the HUD-1 forms, BOMC raises concerns about the closing instructions and first lien letters relating to the loans at issue. Written closing instructions advise a closer about the various documents borrowers are required to sign. The closing instructions on the loans at issue generically showed a title company as the closer on both the purchase loans and refinance loans. LMS or PBCS prepared the first lien letters, making them appear as though they came from the Title Companies. The letters indicated the Title Companies had closed and disbursed BOMC's loans and that BOMC had a valid first lien. Every first lien letter BOMC received on the refinance

-6-

loans was blank. In other words, the letters had not been signed by the Title Companies because they had not closed or disbursed the loans.[7]

None of the Title Companies prepared or delivered to BOMC any closing documents for the loans at issue, nor did they close or disburse loan proceeds in connection with the loans. PBCS prepared the closing documents[8] that LMS used on the loans it sold to BOMC. The Title Companies' only role with regard to the loans at issue was limited to providing title insurance commitments to LMS and recording documents.

As noted above, it was only after LMS's involuntary bankruptcy in March 1994 that BOMC discovered the prior mortgages on certain refinance loans had not been paid. BOMC had no prior communication with the Title Companies about loans LMS originated.

On August 31, 1994 Iadevito pled guilty to violating 18 U.S.C. § 1344, financial institution fraud. At his sentencing, Iadevito admitted that he caused LMS to implement a scheme to defraud BOMC and two other financial institutions. Iadevito's scheme to defraud used HUD-1 forms that falsely represented that the Title Companies had served as settlement agent for loans BOMC bought from LMS. Iadevito pled guilty to misappropriating $4.7 million of BOMC's money.

---

[7]One of the letters dated November 18, 1993 from First American Title Company indicated in all capital letters: "WE DID NOT DISBURSE OR CLOSE ON THIS, THEREFORE I CANNOT VERIFY THE ABOVE STATEMENT."

[8]These included a HUD-1 form, closing instructions, and a first lien clearance letter.

BOMC sued the defendants in the United States District Court for the Northern District of Oklahoma alleging fraud, breach of fiduciary duty, Civil RICO and RICO Conspiracy for both its direct claims and for its homeowner-assigned claims.[9] The district court ultimately granted summary judgment to the defendants on all of BOMC's direct and homeowner-assigned claims. BOMC appeals. We affirm.

## DISCUSSION

### I. Standard of Review

We review a district court's decision on summary judgment *de novo*. Dye v. United States, 121 F.3d 1399, 1403 (10th Cir. 1997). "We apply the same standard under Fed.R.Civ.P. 56(c) used by the district court: we determine whether any genuine issue of material fact was in dispute, and, if not, whether the moving party was entitled to judgment as a matter of law." Id. at 1403-04.

"The moving party has the initial burden to show 'that there is an absence of evidence to support the nonmoving party's case.'" Bacchus Industr., Inc. v. Arvin Industr., Inc., 939 F.2d 887, 891 (10th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986)). Once the moving party has met its burden, the burden then shifts to the nonmoving party, who must offer evidence of specific facts that is sufficient to raise a "genuine issue of material fact."

---

[9]For its direct claims, BOMC seeks recovery on all 42 refinance loans on which the prior mortgages were not paid. For its homeowner-assigned claims, BOMC seeks recovery on 31 of the 42 refinance loans.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); Biester v. Midwest Health Servs., Inc., 77 F.3d 1264, 1266 (10th Cir. 1996); Bacchus, 939 F.2d at 891. The party opposing the motion "'may not rest upon the mere allegations or denials of his pleadings' to avoid summary judgment." Bacchus, 939 F.2d at 891 (quoting Anderson, 477 U.S. at 248, 106 S. Ct. at 2510).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-48, 106 S. Ct. at 2510. Summary judgment is appropriate only if "there is [not] sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Id. at 249, 106 S. Ct. at 2511. Thus, this Court's inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52, 106 S. Ct. at 2512. When considering motions for summary judgment, we examine all evidence in the light most favorable to the nonmoving party. Dye, 121 F.3d at 1403; Jones v. Unisys Corp., 54 F.3d 624, 628 (10th Cir. 1995).

## II. Civil RICO Claims

### A. The McCarran-Ferguson Act

The McCarran-Ferguson Act provides: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b) (1997). In other words, the Act bars the application of a federal statute if (1) the federal statute does not specifically relate to the business of insurance; (2) a state statute has been enacted for the purpose of regulating the business of insurance; and (3) the federal statute would invalidate, impair, or supersede the state statute. United States Dep't of Treasury v. Fabe, 508 U.S. 491, 501, 113 S. Ct. 2202, 2208, 124 L. Ed. 2d 449 (1993).

The Title Companies argue that BOMC's RICO claims are barred by the McCarran-Ferguson Act because (1) Missouri has created a comprehensive statutory and regulatory scheme to regulate the business of title insurance and (2) application of RICO would "invalidate, impair or supersede" Missouri's regulation of insurance. BOMC argues its direct claims are based on the false representations that the Title Companies were the settlement agent and responsible for paying off prior mortgages. Settlement services, it contends, are not the "business of insurance." In addition, BOMC argues that its homeowners' RICO claims are not barred because they involve settlement and closing, which are also not "the business of insurance." BOMC further argues that because

-10-

Missouri allows private rights of action under other state law, the McCarran-Ferguson Act does not apply to RICO claims arising in Missouri.

In recent years, the issue of whether the McCarran-Ferguson Act bars federal RICO claims has caused a split among the circuits. The Fourth, Sixth and Eighth Circuits adopted the "upset the balance" approach. See Ambrose v. Blue Cross & Blue Shield of Va., Inc., 891 F. Supp. 1153 (E.D. Va. 1995), aff'd 95 F.3d 41 (4th Cir. 1996); Kenty v. Bank One, Columbus, N.A., 92 F.3d 384 (6th Cir. 1996); Doe v. Norwest Bank Minnesota, N.A., 107 F.3d 1297 (8th Cir. 1997). Under this approach, the McCarran-Ferguson Act would bar federal RICO claims, the concern being that RICO would not only invalidate states' determinations regarding the appropriate remedies for certain conduct, but would supersede remedies and regulatory supervision provided by state laws as well.

The First, Third, Seventh and Ninth Circuits adopted the "direct conflict approach." See Villafane-Neriz v. Federal Deposit Ins. Corp., 75 F.3d 727 (1st Cir. 1996) (McCarran-Ferguson Act and FDIC regulations at issue); Sabo v. Metropolitan Life Ins. Co., 137 F.3d 185 (3d Cir. 1998); NAACP v. American Family Mut. Ins. Co., 978 F.2d 287 (7th Cir. 1992) (McCarran-Ferguson Act and Fair Housing Act at issue); Forsyth v. Humana, Inc., 114 F.3d 1467 (9th Cir. 1997); Merchants Home Delivery Serv., Inc. v. Frank B. Hall & Co., 50 F.3d 1486 (9th Cir. 1995). Under the "direct conflict" approach, the McCarran-Ferguson Act does not preclude application of a federal statute prohibiting

-11-

acts that are also prohibited under state insurance laws, which would include federal RICO claims.

This circuit split prompted the Supreme Court to address the issue in Humana Inc. v. Forsyth, 525 U.S. 299, 119 S. Ct. 710, 142 L. Ed. 2d 753 (1999), which was decided after this case was submitted. The controversy in Forsyth arose from a scheme implemented by Humana Insurance, a group health insurer, to obtain discounts for hospital services that it did not disclose and pass on to the plaintiffs, its policy beneficiaries. Id. at ---- - ----, 119 S. Ct. at 714. Plaintiffs alleged the scheme violated both RICO and Nevada law. Id. The defendant argued that the McCarran-Ferguson Act barred plaintiffs' RICO claims. Id. at ---- - ----, 119 S. Ct. at 715.

The Court first determined that RICO is not a law that "specifically relates to the business of insurance." Id. at ---- - ----, 119 S. Ct. at 716. The Court then noted that the case turned on the following question: "Would RICO's application to the employee beneficiaries' claims at issue 'invalidate, impair, or supersede' Nevada's laws regulating insurance?" Id. The Court defined "invalidate" as "to render ineffective, generally without providing a replacement rule or law" and "supersede" as "to displace (and thus render ineffective) while providing a substitute rule." Id. The Court concluded RICO's application to the policy beneficiaries' complaint would neither invalidate nor supersede Nevada law. Id.

The key question then became whether RICO's application to the defendant's alleged scheme would "impair" Nevada's law. The Court refused to adopt a definition of "impair" that "signals the federal legislators' intent 'to withdraw Congress from the field [of insurance] absent an express congressional statement to the contrary.'" Id. at ---- - ----, 119 S. Ct. at 717 (quoting Brief for Petitioners at 10). In the Court's view, such a reading of "impair" "would convey 'a very broad proscription against applying federal law where a state has regulated, or chosen not to regulate, in the insurance industry.'" Id. (quoting Merchants Home, 50 F.3d at 1491). The Court also refused to adopt the polar opposite of that view, i.e., "that Congress intended a green light for federal regulation whenever the federal law does not collide head on with state regulation." Id. Instead, the Court found that "impair" means "[t]o weaken, to make worse, to lessen in power, diminish, or relax, or otherwise affect in an injurious manner." Id. (quoting Black's Law Dictionary 752 (6th ed. 1990)). The Court went on to hold that "[w]hen federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application." Id.

The Court concluded that "suit under RICO by policy beneficiaries would not 'impair' Nevada law and therefore is not precluded by the McCarran-Ferguson Act." Id. at ---- - ----, 119 S. Ct. at 718. Nevada law provides both statutory and common law remedies to control insurance fraud. Id. "Because RICO advances the State's interest in

combating insurance fraud, and does not frustrate any articulated Nevada policy, . . . the McCarran-Ferguson Act does not block the respondent policy beneficiaries' recourse to RICO." Id. at ---- - ----, 119 S. Ct. at 719.

The Supreme Court's decision in Forsyth compels us to hold that BOMC's RICO claims are not barred by the McCarran-Ferguson Act. RICO "advances" Missouri's "interest in combating insurance fraud" and "does not frustrate any articulated [Missouri] policy." Although Missouri does not provide a private cause of action under its Unfair Trade Practice Act, it does allow causes of action under other state law. See Mo. Rev. Stat. § 375.944(4) (1991). Therefore, the McCarran-Ferguson Act does not bar BOMC's RICO claims.

## B. 18 U.S.C. § 1962(c) Claims

BOMC brought its direct and homeowner-assigned civil RICO claims pursuant to 18 U.S.C. § 1964(c) (Supp. 1999), alleging violations based on 18 U.S.C. § 1962(c) (1984), which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

A person in a civil action who is found to have violated RICO is liable for treble damages, costs, and attorney's fees. Id. § 1964(c).

-14-

The Title Companies moved for summary judgment on BOMC's RICO claims, arguing: (1) the Title Companies did not participate in the operation or management of the affairs of the RICO enterprise; (2) the Title Companies' actions are not predicate acts under the RICO statute; (3) the Title Companies' conduct was not the proximate cause of BOMC's injury; and (4) the McCarran-Ferguson Act precludes BOMC's RICO claims.[10]

The district court granted summary judgment to the Title Companies, finding they had not directed in any way the activities of the alleged RICO enterprise. The district court further found that the Title Companies did not engage in a "pattern of racketeering activity," as required by 18 U.S.C. § 1962(c), because they had not committed any predicate acts, as defined by 18 U.S.C. § 1961(1) (Supp. 1999). The district court did not address the Title Companies' remaining arguments, because it concluded the above-cited reasons alone--no direction of the activities of the alleged RICO enterprise and no pattern of racketeering activity--were sufficient to warrant summary judgment for the Title Companies. For the reasons set forth below, we agree with the district court.

To establish a civil RICO claim under 18 U.S.C. § 1962(c), BOMC must show that the Title Companies "(1) participated in the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Resolution Trust Corp. v. Stone, 998 F.2d 1534,

---

[10]As we just noted, the Title Companies' fourth argument fails in light of the Supreme Court's decision in Forsyth.

1541 (10th Cir. 1993) (citing Phelps v. Wichita Eagle-Beacon, 886 F.2d 1262, 1273 (10th Cir. 1989)).

The Supreme Court has adopted the "operation or management" test to determine whether a defendant has "participated in the conduct" of the affairs of a RICO enterprise. Id. (citing Reves v. Ernst & Young (Reves II), 507 U.S. 170, ---- - ----, 113 S. Ct. 1163, 1170-73, 122 L. Ed. 2d 525 (1993)).   For liability to be imposed under that test,  the defendants must have participated in the operation or management of the RICO enterprise.   Id.

> "[O]ne must have some part in directing those affairs" of the enterprise,  id. at ----, 113 S.Ct. at 1170, although it is not necessary for the participant to have "significant" control, id. at ---- n. 4, 113 S.Ct. at 1170 n. 4 (rejecting the District of Columbia Circuit's formulation of the operation and management test in Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639, 913 F.2d 948, 954 (D.C.Cir.1990) (en banc), cert. denied, 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991)).  "[T]he word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required." Reves II, 507 U.S. at ----, 113 S.Ct. at 1170 (footnote omitted).

Id. (footnote omitted).   Outsiders, such as the Title Companies, who are associated with a RICO enterprise and participate in the operation or management of the enterprise may also be liable under § 1962(c).  Reves II, 507 U.S. at 185, 113 S. Ct. at 1173.

Applying this test to the facts before us, BOMC has failed to establish the first element of its RICO claims, i.e., that the Title Companies "participated in the conduct" of

-16-

the alleged RICO enterprise. There is no evidence suggesting the defendants directed any part of the alleged RICO enterprise. The Title Companies did nothing more than provide their regular services, which included closing-related services such as recording documents and issuing title commitments. However, BOMC claims the defendants allowed, if not actively encouraged, LMS and PBCS to carry on with their scheme. It further argues the defendants participated, directly or indirectly, in the <u>management</u> of the RICO enterprise by engaging in numerous, various activities. <u>See</u> Appellant's br. at 45-46. These activities include: failing to correct the false HUD-1 forms; requiring that LMS show the Title Companies as Settlement Agent on the HUD-1 forms; agreeing with LMS, as a condition of doing business, that LMS could falsely show the Title Companies as Settlement Agent on the HUD-1 forms; deciding to continue to mislead homeowners when they called to ask why their prior mortgages had not been paid off; deciding not to tell homeowners the truth about what title insurance did and did not cover; deciding not to tell homeowners or BOMC the truth about LMS's shaky financial condition; deciding to issue a title commitment to help the closing process along on the 347 loans; deciding to issue final title policies on all except the 31 loans; deciding to use a materially misleading closing affidavit printed on the Title Company's own form; deciding to sign false HUD-1 forms in BOMC purchase loans; and agreeing with LMS that LMS could falsely show their Title Company as Settlement Agent on the HUD-1 forms in refinance loans. <u>Id.</u>

There is simply no support in the record for these claims. In support of its claim that the Title Companies were involved in managing the RICO enterprise, BOMC relies repeatedly upon a memorandum prepared by Iadevito and Janson, which contains broad conclusory statements about the Title Companies generally, but absolutely no specifics as to persons, dates, transactions or amounts. See A 5389-92. Not only does this memorandum lack the necessary particularity to establish fraud, it is completely lacking in rudimentary foundational elements for admissibility. For purposes of summary judgment, "facts" must be established by evidence which would be admissible at trial. Thomas v. International Bus. Machs., 48 F.3d 478, 485 (10th Cir. 1995). Similarly, BOMC uses the affidavit of Theresa Janson to support its claim that the Title Companies actively directed, participated in or acquiesced in LMS's and PBCS's conduct in preparing documents, forging title company signatures and misrepresenting the title company's role in refinance transactions. See A 6470-71. This affidavit suffers from the same lack of specificity that afflicts the Iadevito/Janson memorandum. It contains sweeping, conclusory statements regarding the Title Companies as a group, but does not mention any single transaction, date or person. While an affidavit is certainly an appropriate vehicle to establish a fact for summary judgment purposes, the affidavit must set forth facts, not conclusory statements. Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995). For purposes of establishing fraud, again, this affidavit falls well short of the degree of specificity necessary to be admissible. Thomas, 48 F.3d at 485. The

-18-

court has carefully reviewed the entire record in this case, which consists of forty-one unsealed volumes and eight sealed volumes of documents and transcripts and finds nothing which provides the kind of support necessary to establish that the Title Companies managed LMS's RICO enterprise.

Further, the Title Companies provided their services only to LMS, which is not sufficient to establish liability under RICO. See University of Maryland at Baltimore v. Peat, Marwick, Main & Co., 996 F.2d 1534, 1539 (3d Cir. 1993) ("Simply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result.").

BOMC also lists numerous activities by the Title Companies that it claims are evidence of their participation, directly or indirectly, in the operation of the RICO enterprise, including: providing figures for LMS to use on HUD-1 forms in LMS refinance loans; recording documents; providing their own printed form closing affidavits for LMS's use; keeping silent when homeowners called to complain about their prior mortgages not being paid off; changing the way they did business with LMS in refinance transactions; failing to correct the material misrepresentations on the HUD-1 forms; failing to tell homeowners the truth about what title insurance did and did not cover; requiring that their Title Company be falsely shown as Settlement Agent on HUD-1 forms; keeping silent about LMS's shaky financial condition; providing title commitments; providing final title policies; providing "check-outs;" allowing false HUD-

1 forms, closing instructions and first lien letters to go to BOMC; and failing to "just say no" to participating in refinance loans and participating in them as they did. Appellant's br. at 46. These claims suffer from the same problems as BOMC's claimed "management" facts. The record simply does not support the claims. Additionally, most of the activities cited are activities the Title Companies would have performed in their normal course of business in dealing with all mortgage lenders, not just LMS. Because BOMC has failed to establish that the title companies directed the activities of or participated in the operations of the alleged RICO enterprise, their § 1962(c) claims fail on that basis.

BOMC's § 1962(c) claims also fail because there is no evidence that the Title Companies or any of them engaged in a "pattern of racketeering activity." RICO specifically defines "racketeering activity" as any act that violates specified state and federal crimes, including mail fraud, wire fraud, and bank fraud. 18 U.S.C. § 1961(1); Resolution Trust Corp., 998 F.2d at 1543. The various acts of racketeering activity described in the statute are often referred to as "predicate acts" because they form the basis for liability under RICO. Bacchus Industr., Inc., 939 F.2d at 891. However, a person does not have to be formally convicted of any predicate act before liability under 18 U.S.C. 1962(c) may attach. Condict v. Condict, 826 F.2d 923, 926 (10th Cir. 1987) (citing Sedima, S.P.R.L. v. Imprex Co., Inc., 473 U.S. 479, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985)).

BOMC claims the Title Companies committed the following predicate acts: mail fraud, in violation of 18 U.S.C. § 1341 (Supp. 1999), wire fraud, in violation of 18 U.S.C. § 1343 (Supp. 1999), and financial institution fraud, in violation of 18 U.S.C. § 1344 (Supp. 1999). To establish a claim of mail fraud under 18 U.S.C. § 1341, BOMC must allege: "(1) the existence of a scheme or artifice to defraud or obtain money or property by false pretenses, representations or promises, and (2) use of the United States mails for the purpose of executing the scheme." Bacchus, 939 F.2d at 892 (citing United States v. Warren, 747 F.2d 1339, 1344 (10th Cir. 1984)). The elements of wire fraud are very similar, but require that the defendant "use interstate wire, radio or television communications in furtherance of the scheme to defraud." Id. (citing 18 U.S.C. § 1343 (1988)). The elements of financial institution fraud include: "(1) that the defendant knowingly executed or attempted to execute a scheme (i) to defraud, or (ii) to obtain property by means of false or fraudulent pretenses, representations or promises; (2) that defendant did so with the intent to defraud; and (3) that the financial institution was then insured by the Federal Deposit Insurance Corporation." United States v. Rackley, 986 F.2d 1357, 1360-61 (10th Cir. 1993) (citing 18 U.S.C. § 1344; United States v. Bonnett, 877 F.2d 1450 (10th Cir.1989)).

Clearly, the common thread among each of these crimes is the concept of "fraud." Actionable fraud consists of (1) a representation; (2) that is false; (3) that is material; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent it

be acted on; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance; (8) the hearer's right to rely on it; and (9) injury. State ex rel. Painewebber, Inc. v. Voorhees, 891 S.W.2d 126, 128 (Mo. 1995) (en banc); Emerick v. Mutual Benefit Life Ins. Co., 756 S.W.2d 513, 519 (Mo. 1988) (en banc).

We conclude, as did the district court, that BOMC has failed to establish that the Title Companies engaged in a "pattern of racketeering activity" as the Title Companies did not commit fraud of any kind.[11]  Having not committed fraud, the Title Companies did not engage in any of the predicate acts defined in 18 U.S.C. § 1961(1).  It follows that because the Title Companies committed no predicate acts, they cannot be found to have engaged in "racketeering activity."  Further, this lack of "racketeering activity" makes it unnecessary to analyze the "pattern" element of the § 1962(c) claims.

## C.  18 U.S.C. § 1962(d) Claims

BOMC further claims the Title Companies violated 18 U.S.C. § 1962(d) (Supp. 1999), which makes it unlawful for any person to conspire to violate 18 U.S.C. § 1962(a), (b), or (c).  The Title Companies moved for summary judgment, arguing BOMC's conspiracy claims fail because its substantive RICO claims are deficient.

A conspiracy claim under 18 U.S.C. § 1962(d) fails when the substantive claim based on § 1962(c) is without merit.  Edwards v. First Nat'l Bank, Bartlesville, Okla., 872

---

[11]For a more detailed explanation of BOMC's failure to establish a claim for fraud, see infra Part III.B.

F.2d 347, 352 (10th Cir. 1989).  Because we have determined BOMC's § 1962(c) claims are without merit, its conspiracy claims under § 1962(d) also fail.

### III.  BOMC's State Law Claims

### A.  Choice of Law

BOMC contends Oklahoma law governs its state law claims.  The Title Companies argue Missouri law governs.  "A federal court sitting in diversity applies the substantive law, including choice of law rules, of the forum state."  Barrett v. Tallon, 30 F.3d 1296, 1300 (10th Cir. 1994).   This rule also applies when a federal court exercises supplemental jurisdiction over state law claims in a federal question lawsuit.  See Glennon v. Dean Witter Reynolds, Inc., 83 F.3d 132, 136 (6th Cir. 1996).   Because Oklahoma is the forum state, its choice of law rules determine whether Oklahoma or Missouri law governs BOMC's fraud and breach of fiduciary duty claims.

Oklahoma choice of law rules require the court to apply the tort law of the state with the most significant relationship to the occurrence and to the parties.  Childs v. Oklahoma ex rel. Oklahoma State Univ., 848 P.2d 571, 578 n.41 (Okla. 1993).  The court considers the following four factors in determining which state's law to apply: "(1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (4) the place where the relationship, if any, between the parties occurred."  Brickner v. Gooden, 525 P.2d 632, 637 (Okla. 1974).

-23-

Applying the above factors, we find that Missouri law governs BOMC's state law claims. Although BOMC's place of business is in Oklahoma and the injury arguably occurred in Oklahoma, Missouri has the most significant relationship to the occurrence and the parties. Missouri is where the alleged fraudulent conduct occurred. The Title Companies' places of business are located in Missouri. Further, the loan transactions giving rise to the Title Companies' alleged relationship with BOMC occurred in Missouri and the principal parties to the underlying purchase mortgage and refinancing mortgages are or were Missouri residents.

## B. Fraud and Breach of Fiduciary Duty Claims

As previously noted in Part II.B, a party alleging fraud in Missouri must establish the following nine elements: (1) a representation; (2) that is false; (3) that is material; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent it be acted on; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance; (8) the hearer's right to rely on it; and (9) injury. Voorhees, 891 S.W.2d at 128; Emerick, 756 S.W.2d at 519. BOMC, as the party alleging fraud, must prove each of the nine elements by clear and convincing evidence. Citizens Bank of Appleton City, Mo. v. Schapeler, 869 S.W.2d 120, 127 (Mo. Ct. App. 1993). BOMC's failure to establish any one of the essential elements is fatal to its recovery. Emerick, 756 S.W.2d at 519. Fraud may not be presumed, but it may be inferred and established by circumstantial evidence. Citizens Bank, 869 S.W.2d at 127.

BOMC has failed to establish the first element of its fraud claim--that the Title Companies made a representation. BOMC attempts to establish this element in two ways. First, it points to the representation on the HUD-1 forms that the Title Companies were acting as settlement agent. Second, it relies on the Title Companies' failure to inform BOMC that LMS was closing the loans and disbursing the loan proceeds.

In analyzing BOMC's fraud claim, we first bear in mind that LMS employees, not the Title Companies, made the false representations on the HUD-1 forms. In order to hold the Title Companies liable for LMS's representations, the facts must establish that LMS was the Title Companies' agent.

Agency is characterized by three elements: (1) an agent's power to alter legal relationships between the principal and third parties and between the principal and agent; (2) a fiduciary relationship with respect to matters within the scope of the agency; and (3) the principal's right to control the conduct of the agent. Karr-Bick Kitchens & Bath, Inc. v. Gemini Coatings, Inc., 932 S.W.2d 877, 879 (Mo. Ct. App. 1996). BOMC, as the party alleging an agency relationship existed between the Title Companies and LMS, has the burden of proof on that issue. Eyberg v. Shah, 773 S.W.2d 887, 890 (Mo. Ct. App. 1989); Henry v. Cervantes-Diversified & Assocs., 700 S.W.2d 89, 92 (Mo. Ct. App. 1985). For the reasons set forth below, we find BOMC has failed in its burden.

Agency may be express, implied or inferred, or apparent. Shelby v. Slepekis, 687 S.W.2d 231, 234 (Mo. Ct. App. 1985). "The relationship of principal and agent and

resultant liability of the principal for the acts of the agent may be created by the express grant of authority by the principal or, absent express agency, the relation may be one of implied or inferred agency or apparent agency." Id. An implied or inferred agency exists by reason of actual authority granted implicitly by the principal to the agent and is often inferred from a prior course of dealing between the alleged principal and the agent. Id. at 235. Implied authority derives from the actual relationship between the principal and the agent, not what third parties may have been told or believe as to the nature of the relationship. Id. The court will not infer agency simply because a third party assumed it existed. Id. Finally, an apparent agency may be created when the conduct of a principal creates an appearance of agency. Id. When the principal's acts lead others to believe the agent possesses authority to act on the principal's behalf, the principal is bound by the agent's acts that are within the scope of the agent's apparent authority. Id. To find an apparent agency, the principal must have created the appearance of the agent's authority. Id. Persons dealing with a supposed agent have a duty to ascertain for themselves the fact and scope of the agency. Eyberg, 773 S.W.2d at 891.

The first element of an agency--the agent's power to alter legal relationships between the principal and others--is lacking in the relationship between LMS and the Title Companies. "A person privileged, or subject to a duty, to perform an act or accomplish a result can properly appoint an agent to perform the act or accomplish the result." Restatement (Second) of Agency § 17. As we noted previously, given the nature

of BOMC's claims, BOMC would have to establish that LMS was acting as the agent of the Title Companies. There is no evidence whatsoever to support such a claim. Here, the Title Companies were not subject to a duty to act as settlement agent for the loans at issue. In the first instance, the BOMC/LMS contract places that duty squarely on LMS. No other written agreement modifies that LMS duty. As we have already discussed, the HUD-1s were prepared solely by PBCS. The Title Companies themselves made no representations and delegated no responsibilities to LMS through the HUD-1s, or any other closing documents, nor could they have as the Title Companies had no powers or duties with respect to closing to delegate. See, e.g., United States v. Clark, 29 F. Supp. 138, 141 (W.D. Mo. 1939) (agent's authority cannot extend beyond his principal's authority). Finally, the conduct of the Title Companies could not have been the source of any agency relationship, as neither the homeowners nor BOMC had any contact with the Title Companies which could have led either to reasonably conclude the Title Companies were the principals in these transactions.

There is no claim, nor is there any evidence to support a claim that the Title Companies were acting as LMS's agents. Such a position would be inconsistent with BOMC's attempt to hold the Title Companies liable in any event.

BOMC next claims the Title Companies' failure to inform it that they were not acting as settlement agent, closing loans and dispersing the proceeds amounts to a misrepresentation. "Silence or nondisclosure equals misrepresentation only where there

is a duty to speak." Voorhees, 891 S.W.2d at 129.    This duty to disclose arises only when a confidential relationship exists between the parties, i.e., a fiduciary relationship, or when one party has superior information not reasonably available to the other.  Id. When fraud is based on a party's silence, "there must be a deliberate suppression of truth and an intention to deceive."  Dobbins v. Kramer, 780 S.W.2d 717, 718-19 (Mo. Ct. App. 1989).

A fiduciary relationship among parties creates a duty to speak.  Therefore, we first must determine whether a fiduciary relationship existed between BOMC and the Title Companies in order to determine whether silence or nondisclosure equals a misrepresentation.   If a fiduciary relationship did not exist between the Title Companies and BOMC, BOMC's breach of fiduciary duty claim will fail.

Missouri law requires the following elements to establish a fiduciary relationship:

(1) as between the parties, one must be subservient to the dominant mind and will of the other as a result of age, state of health, illiteracy, mental disability, or ignorance; (2) things of value such as land, monies, a business, or other things of value which are the property of the subservient person must be possessed or managed by the dominant party; (3) there must be a surrender of independence by the subservient party to the dominant party; (4) there must be an automatic or habitual manipulation of the actions of the subservient party by the dominant party; and (5) there must be a showing that the subservient party places a trust and confidence in the dominant party.

Emerick, 756 S.W.2d at 526-27.

-28-

We find no such relationship existed between BOMC and the Title Companies.[12] There is no "dominance" or "subservience" as contemplated by Missouri law. The Title Companies did not possess or manage any property owned by BOMC. Furthermore, there is no evidence that BOMC surrendered its independence to the Title Companies. BOMC had no contact with the Title Companies until after LMS went bankrupt and it discovered the prior mortgages had not been paid. In addition, the record fails to show that the Title Companies manipulated BOMC's actions in any manner. Finally, BOMC may have trusted that the Title Companies were closing its loans, but this trust was based on representations made by LMS, not the Title Companies.

Because no fiduciary relationship existed between BOMC and the Title Companies, the Title Companies were under no obligation to inform BOMC they were not acting as settlement agent, closing loans, and dispersing the proceeds. Since there was no fiduciary relationship, BOMC's breach of fiduciary duty claim is without merit.

A duty to speak may also arise when one party has superior information not reasonably available to the other. Voorhees, 891 S.W.2d at 129. BOMC, as the party alleging nondisclosure, must show that "the nondisclosed information was beyond [its] reasonable reach and not discoverable by [BOMC] in the exercise of reasonable

---

[12]"There are, however, instances in which a fiduciary relationship exists absent the above elements." A.G. Edwards & Sons, Inc. v. Drew, 978 S.W.2d 386, 394 (Mo. Ct. App. 1998). Such instances include the attorney-client relationship, the physician-patient relationship, and the principal-agent relationship, none of which exist in this case. Id.

diligence." <u>Fairmont Foods Co. v. Skelly Oil Co.</u>, 616 S.W.2d 548, 550 (Mo. Ct. App. 1981). In other words, BOMC has the burden of establishing that in the exercise of reasonable diligence it could not have and would not have discovered that the Title Companies were not closing its loans, as represented by LMS. <u>Id.</u> "A party must exercise reasonable care in view of his situation to ascertain the truth before he can say he was misled, unless inquiry was prevented by the fraudfeasor." <u>Id.</u> at 552. In this case, whether the Title Companies were in fact acting as settlement agents on the loans at issue was information that was reasonably ascertainable by BOMC. Furthermore, there is no evidence suggesting the Title Companies or any other person or entity prevented BOMC from inquiring into whether they were closing its loans. Instead, the record indicates BOMC's only contacts with the Title Companies occurred after it discovered the prior mortgages on the loans had not been paid.

The Title Companies are entitled to summary judgment on BOMC's fraud claim because BOMC has not established the first element of fraud--a representation by the Title Companies. The Title Companies neither made affirmative representations to BOMC, nor failed to disclose information. Because BOMC's failure to establish the first element of fraud is fatal to its claim, it is unnecessary for us to analyze the remaining eight elements. <u>Emerick</u>, 756 S.W.2d at 519.

**IV. The Homeowners' State Law Claims: Fraud and Breach of Fiduciary Duty**

Missouri law also applies to the homeowners' state law claims.[13]  Therefore, the legal standards set forth above regarding fraud and breach of fiduciary duty also apply to the homeowners' claims.   BOMC cites various acts by the Title Companies that it claims constitute fraud.  BOMC claims the Title Companies knew the homeowners thought title insurance would take care of any problems regarding payoff of their prior mortgages.  Further, BOMC claims the homeowners did not realize the title insurance was for the lender's protection, not their own.  BOMC contends the closing affidavits provided by the Title Companies to LMS implied that title insurance was being issued, without any qualifications or exceptions.  Appellant's Br. at 28.

Like BOMC's direct claim, the homeowners' claim for fraud does not include a representation by the Title Companies.  The closing affidavits on which BOMC relies were basically blank forms provided by the Title Companies, seeking information from the borrowers.  Nowhere on those affidavits did the Title Companies represent they were issuing title insurance policies to protect the borrowers or the lender.  The homeowners made representations in the closing affidavits, not the Title Companies.  No Title Company representatives were ever present at the closings of the loans at issue.  Therefore, the Title Companies could not have created any false impressions for the

---

[13]BOMC concedes that Missouri law should apply to the homeowners' claims.

homeowners to rely on. Any false impressions would have been created by LMS's representatives.

In addition, the HUD-1 forms for the loans at issue reflected that payment for title insurance was for the lender's coverage; the owner's coverage line was blank. Appellee's Br. at 12. Further, LMS provided a HUD booklet entitled, "Your Guide to Settlement Costs" to the homeowners. Id. LMS provided these booklets even though RESPA did not require it in refinancing situations. The information provided in this booklet advised the homeowners that a title insurance policy issued only to the lender would not protect them. Id. It further advised that if the homeowners wanted to protect themselves, they would need to purchase an owner's policy. The Title Companies made no representations to the homeowners. The representations LMS made, via the settlement costs booklet, warned the homeowners that a lender's policy would not protect them. Therefore, any beliefs the homeowners may have had with regard to a lender's policy protecting their own interests were unreasonable and do not form a basis for a fraud claim against the Title Companies.

In addition, "insurance agents in Missouri have no general duty to advise potential customers of optional coverages that may be available." Farmers Ins. Co. v. McCarthy, 871 S.W.2d 82, 86 (Mo. Ct. App. 1994). Thus, the Title Companies had no obligation to inform the homeowners about a title insurance policy that would protect their interests.

-32-

BOMC has failed to establish that a fiduciary relationship existed between the Title Companies and the homeowners. The Title Companies never issued title insurance policies to the homeowners. The record does not reflect any attempt by any homeowner to purchase title insurance policies to protect the homeowner's interests. The Title Companies only presented commitments to issue title insurance, which indicated title insurance would be available, provided the prior mortgages were paid in full. The Title Companies presented these commitments to LMS, not the homeowners. Further, any title insurance policy that would have been issued would have been to BOMC to protect its interests, not the homeowners. As noted above, the Title Companies did not issue title insurance policies to anyone, because the prior mortgages on the homeowners' homes were not paid.

Like BOMC, the homeowners have no basis for a breach of fiduciary duty claim because no fiduciary relationship existed. Any trust a homeowner placed in the Title Companies was based on something other than Title Company representations. Under Missouri law, a "[f]iduciary duty is not created by a unilateral decision to repose trust and confidence; it derives from the conduct or undertaking of the purported fiduciary which is recognized by the law as justifying such reliance." <u>Farmers Ins. Co.</u>, 871 S.W.2d at 87. Here, the Title Companies, the alleged fiduciaries, did not conduct themselves in a manner that would justify the homeowners' alleged reliance.

BOMC further asserts that the Title Companies voluntarily assumed a fiduciary relationship with the homeowners. It cites no authority for this proposition. More compelling, the record belies the assertion. As we have noted previously, the Title Companies had a very limited role in these transactions which simply does not lend itself to BOMC's claims.

Finally, as another basis for its claim for breach of fiduciary duty, BOMC argues the Title Companies made LMS their agent to pay off the prior mortgages and are liable for LMS's failure to do so. With this argument, BOMC focuses on the wrong relationship. In order to establish a breach of fiduciary duty to the homeowners, BOMC would have to show an agency relationship existed between the Title Companies and the homeowners, not the Title Companies and LMS, as BOMC has alleged. See A.G. Edwards & Sons, Inc., 978 S.W.2d at 395 ("Once an agency relationship has been established, a fiduciary relationship arises as a matter of law.").

## CONCLUSION

For the reasons stated above, the district court's various decisions granting summary judgment in favor of the defendants on all of BOMC's direct and homeowner-assigned claims are **AFFIRMED**.