**AMERICAN MULTI–CINEMA, INC., Plaintiff,**

**v.**

**SOUTHROADS, L.L.C., Defendant.**

No. 99–2019–JWL.

United States District Court, D. Kansas.

July 28, 2000.

John L. Vratil, W. Joseph Hatley, Lathrop & Gage L.C., Overland Park, KS, for plaintiff.

Charles W. German, Rouse, Hendricks, German, May & Shank, Kansas City, MO, for defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

This suit arises out of a retail lease agreement between plaintiff, as tenant, and defendant, as landlord.[1] Plaintiff alleges that defendant breached the lease, and certain amendments thereto, by failing to deliver timely physical possession of the leased premises to plaintiff and by failing to complete timely various tasks associated with the shopping center of which plaintiff was one tenant. Plaintiff seeks liquidated damages pursuant to a stipulated damages provision in the lease. Defendant, on the other hand, contends that the stipulated damages provision is an unenforceable penalty. This matter is presently before the court on defendant's motion for summary judgment (doc. # 95).

As set forth in more detail below, the choice of which state's law to apply to this case could very well determine which party ultimately prevails at trial. Nonetheless, because material factual disputes exist concerning the place of the contract's formation, the court does not decide the choice-of-law issue at this stage of the proceeding. Even assuming, however, that Oklahoma law applies to this case, as defendant suggests, the court concludes that the evidence, viewed in the light most favorable to plaintiff, requires a trial on plaintiff's claims. Put briefly, the court has no difficulty concluding that defendant has not met its burden on summary judgment to show that the uncontroverted facts demonstrate that plaintiff's potential damages from defendant's breach of the lease were not extremely difficult to ascertain at the time of contracting. Similarly, the court has little difficulty concluding that defendant falls short of meeting its summary judgment burden to show that the uncontroverted facts fail to demonstrate that the stipulated sum was reasonably proportionate to plaintiff's probable actual harm suffered prior to the time plaintiff opened for business. The more difficult decision is whether defendant has satisfied its summary judgment burden to demonstrate that the uncontroverted facts fail to show that the stipulated sum was reasonably proportionate to plaintiff's probable actual harm suffered for the period of time after plaintiff opened for business. Nonetheless, the court concludes that, while a closer call, defendant has failed to meet this burden. Thus, defendant's motion for summary judgment is denied.

## I. Facts

The following facts are either uncontroverted or related in the light most favorable to plaintiff, the nonmoving party. In December 1995, plaintiff and Yale 41 Associates Limited Partnership executed a re-

---

1. The original landlord on the lease was an entity called Yale 41 Associates Limited Partnership. Yale 41's rights and responsibilities under the lease were subsequently assigned to defendant.

tail lease agreement whereby Yale 41 was the landlord and plaintiff was a tenant in a new shopping center located in Tulsa, Oklahoma. Yale 41's rights and responsibilities under the lease were subsequently assigned to defendant and the shopping center, at some point thereafter, was named the Southroads shopping center.

The lease agreement, including a September 1996 amendment thereto, required defendant to provide to plaintiff by November 15, 1996 a pad site with utilities on which plaintiff would construct a "megaplex" movie theater—the Southroads 20. This November 15, 1996 deadline is referred to in the lease and by the parties in their papers as the "turnover date." The lease agreement and the September 1996 amendment further provided that defendant was to complete by May 30, 1997 a variety of tasks associated with the Southroads shopping center, including the construction of all common facilities and access facilities. This May 30, 1997 deadline is referred to in the lease and by the parties in their papers as the "completion date." According to plaintiff's evidence, plaintiff intended to open its megaplex theater during the summer of 1997.

According to plaintiff, defendant breached the lease agreement and the September 1996 amendment thereto by failing to provide a certified pad site in a timely fashion and by failing to complete the various tasks associated with the completion of the Southroads shopping center. Plaintiff's evidence indicates that the pad site was not provided until March 11, 1997 and that, as a result, the Southroads 20 did not open for business until November 21, 1997. Plaintiff's evidence further indicates that defendant did not complete the tasks related to the completion date until July 31, 1998 and that, as a result, the Southroads 20 continued to suffer in a variety of ways and, in fact, may continue to suffer today.

Specifically, plaintiff asserts that, as a result of defendant's breach of the turn-over date, it was not able to open its theater during the summer of 1997 as scheduled and, thus, it lost income. Plaintiff further asserts that, as a result of defendant's breach of the completion date, it was forced to build its theater in the midst of major ongoing construction, thereby increasing its construction costs due to work coordination problems; that it lost customers who, had they been able to shop at a completed center, would have learned about the anticipated opening of the Southroads 20; and that, once the theater opened, it lost customers who either had negative experiences at the Southroads 20 in large part because of the unfinished nature of the center or who simply elected not to go to the Southroads 20 because they could not combine a trip to the movies with a shopping trip.

Pursuant to article 5 of the lease, if defendant failed to meet either the turn-over date or the completion date, then plaintiff was entitled to "receive an amount equal to four days of free Annual Fixed Rent for each day of delay" between the completion date or the turnover date and the date on which defendant fully performed its obligations (*i.e.*, providing a certified pad site and/or completing the tasks associated with the Southroads shopping center). This provision for stipulated damages is referred to by the parties as the 4 to 1 provision. Pursuant to the stipulated damages provision, plaintiff seeks stipulated damages relating to the turnover date for the period from November 15, 1996 through March 11, 1997.[2] With respect to the completion date, plaintiff seeks stipulated damages from May 30, 1997 through July 31, 1998.[3]

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a

---

**2.** For this period, then, plaintiff seeks liquidated damages of approximately $1.14 million.

**3.** For this period, then, plaintiff seeks liquidated damages of approximately $4.2 million.

matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

■ The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *see Adler,* 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler,* 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, depo-

sition transcripts, or specific exhibits incorporated therein." *Id.*

■ Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## III. Choice–of–Law Issues

■ The threshold issue in this case is which state's law to apply. In determining the applicable law, a federal court sitting in diversity must apply the substantive law of the state in which it sits, including that state's choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Bancoklahoma Mortgage Corp. v. Capital Title Co.,* 194 F.3d 1089, 1103 (10th Cir.1999). Kansas courts apply the doctrine of lex loci contractus, which requires that the court interpret the contract according to the law of the state in which the parties performed the last act necessary to form the contract. *See Missouri Pac. R.R. Co. v. Kansas Gas and Elec. Co.,* 862 F.2d 796, 798 n. 1 (10th Cir.1988) (citing *Simms v. Metropolitan Life Ins. Co.,* 9 Kan.App.2d 640, 642–43, 685 P.2d 321 (1984)).

■ The parties disagree with respect to where the last act necessary to complete the lease agreement occurred. In its papers, defendant maintains that the only "reasonable conclusion" is that the "last act necessary" occurred in Oklahoma. According to defendant, the lease was executed by Yale 41 in Tulsa after AMC executed the lease in Missouri and sent it to Yale 41 via federal express. Plaintiff, on the other hand, contends that the last act necessary to formation of the contract occurred in Missouri. According to plaintiff, the lease was transmitted to Yale 41 with two "conditions precedent" to the formation of the lease agreement.[4] In support of this argument, plaintiff highlights the transmittal

---

4. In its papers, plaintiff uses the phrase "con-

dition precedent" to refer to an event that

letter that accompanied the lease when the lease was sent to Yale 41. The letter included the following instructions:

We are delivering these [lease] documents to you in escrow, and they are not to be released by you from escrow, nor to be considered effective or binding for any purpose, unless and until (i) we provide you with a Title Commitment (which we have approved), and instruct you to attach the same to the Lease as Exhibit E, and (ii) we advise you that we have reached agreement with Guaranty Federal Bank, fsb with respect to the Subordination, Non–Disturbance and Attornment Agreement.

Plaintiff urges that this transmittal letter created conditions to formation, not merely conditions to performance. According to plaintiff, then, the last act necessary to formation of the contract occurred in Missouri, the place where the conditions were ultimately satisfied.

 The choice of which state's law to apply appears to be critical to the resolution of this case. Under Oklahoma law, for example, the burden would be on AMC, as the party seeking enforcement of the stipulated damages provision, to establish that the stipulated damages provision does not impose a penalty. *See, e.g., Waggoner v. Johnston,* 1965 OK 192, 408 P.2d 761, 768–69 (1965). By contrast, under Missouri law, the burden is apparently on Southroads, as the party challenging the stipulated damages provision, to prove that the provision is a penalty. *See, e.g., Manufacturers Casualty Ins. Co. v. Sho–Me Power Corp.,* 157 F.Supp. 681, 684 (W.D.Mo.1957).[5] Nonetheless, the court, for two reasons, declines to resolve the issue at this stage of the proceeding. First, the record before the court reflects the existence of material factual disputes concerning the formation of the contract. Second, even assuming that Oklahoma law applies to the case, the court would nonetheless deny defendant's motion for summary judgment. In other words, although the choice-of-law issue may be critical after a full trial on the merits,[6] it is not critical

must occur before the contract is formed. To reduce any confusion, the court notes that plaintiff's use of the phrase "condition precedent" does not conform with the prevailing definition of the phrase. According to the Restatement (Second) of Contracts, a condition is an event which must occur before performance under a contract becomes due. *See* E. Allan Farnsworth, *Contracts* § 8.2 (2d ed.1990) (citing Restatement (Second) of Contracts § 224). In other words, the Restatement Second uses the term "condition" in the context of an existing contract. *See id.* It excludes precontractual events, such as the acceptance of an offer, that must occur before a contract is made. *See id.* Thus, under the Restatement Second definition, "the making of a contract marks the border between the law of offer and acceptance, which relates to the formation stage, and the law of conditions, which relates to the performance stage." *Id.* Plaintiff's argument, then, construed in accordance with the Restatement Second, is that the transmittal letter was, in effect, a counteroffer. That is, the letter contained two "precontractual events" that, according to AMC, must have occurred before any contract was formed.

5. Plaintiff directs the court to only one case, *Sho–Me Power,* addressing the burden of proof issue. The court has not uncovered any additional Missouri cases on this issue. That allocation of the burden of proof is consistent, however, with the modern trend of courts placing the burden of proof on the party challenging a stipulated damages provision. *See Wasserman's Inc. v. Township of Middletown,* 137 N.J. 238, 645 A.2d 100, 108 (1994). Nevertheless, Southroads challenges this interpretation of Missouri law and contends that certain language in the decisions of the Missouri Supreme Court and Missouri Court of Appeals suggests that Missouri would place the burden on plaintiff to prove that the provision is not a penalty. Southroads, however, does not specifically highlight any of this language and does not direct the court to any cases supporting its argument. In short, the court expects the parties to brief this issue more completely in connection with the trial of this case.

6. In its papers, plaintiff argues in the alternative that the conflict between Oklahoma law and Missouri law on the burden-of-proof issue is immaterial because the burden of proof is a procedural issue in Kansas and, thus, Kansas burden-of-proof principles must be applied to this case. Not surprisingly, Kansas law would place the burden on defendant, as the party challenging the stipulated damages provision, to prove that the provision is an unen-

for purposes of resolving defendant's motion. Thus, in analyzing defendant's motion for summary judgment, the court will apply Oklahoma law. After trial, however, the court will make a final determination concerning which state's law applies.

## IV. The Merits of Defendant's Motion

■ Before turning to the merits of defendant's motion, the court pauses to set forth the applicable law governing stipulated damages. As set forth above, the court assumes for purposes of defendant's motion only that Oklahoma law applies to the case. Oklahoma regulates by statute the enforceability of a provision for stipulated damages. *See* Okla. Stat. Ann tit. 15, §§ 213–215 (West 1993). Under that statutory scheme, a contractual provision for stipulated damages "shall be held ·valid, when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damages." *See* Okla. Stat. Ann. tit. 15, § 215(A). If the stipulated damages, however, impose a penalty, then the provision will be deemed void even if the damage resulting from a breach would be difficult to ascertain. *See Sun Ridge Investors, Ltd. v. Parker,* 1998 OK 22, 956 P.2d 876, 877 (1998); *Waggoner v. Johnston,* 1965 OK 192, 408 P.2d 761, 768–69 (1965) (language of Okla. Stat. Ann. tit. 15, § 215(A) must be construed in conjunction with the language of two preceding sections). The burden of establishing that damages would be difficult to ascertain and that the provision does not impose a penalty rests on the party seeking to enforce the stipulated damages provision. *See Fretwell v. Protection Alarm Co.,* 1988 OK 84, 764 P.2d 149, 152 n. 3 (1988) (citing *Massey v. Love,* 1970 OK 199, 478 P.2d 948 (1970)); *Waggoner,* 408 P.2d at 768–69. Nonetheless, Oklahoma courts favor enforcement of contractual forfeiture provi-

sions where damages are difficult to determine. *See ·Waggoner,* 408 P.2d at 770 ("[T]his court favors the interpretation of a forfeiture ·provision in a contract, where damages are difficult to determine, to be one for liquidated damages and not a penalty."); *accord* E. Allan Farnsworth, *Contracts* § 12.18 (2d ed. 1990) ("[T]he trend has been to favor freedom of contract by enforcing [liquidated damages] clauses as long as they do not clearly disregard the principle of compensation").

■ The Supreme Court of Oklahoma has identified three criteria by which a valid liquidated damages clause may be distinguished from a penalty: (1) the injury caused by the breach must be difficult or impossible to estimate accurately; (2) the parties must intend to provide for damages rather than for a penalty; and (3) the sum stipulated must be a reasonable pre-breach estimate of the probable loss or reasonably proportionate to the actual damage sustained at the time of the breach. *See Sun Ridge Investors,* 956 P.2d at 878; *Waggoner,* 408 P.2d at 769. In essence, liquidated damages are permitted where the actual damages are by their nature uncertain and where they are not clearly disproportionate to probable actual harm. *See B & B Lines, Inc. v. Ryan Freight Lines, Inc.,* 1979 Ok Civ App 54, 601 P.2d 1207, 1209 (1979).

With this legal framework in mind, the court turns to the merits of defendant's motion for summary judgment. According to defendant, summary judgment is appropriate because the parties themselves believed that the 4 to 1 provision was a penalty; because ascertaining damages at· the time of contracting was not difficult or impractical; because the 4 to 1 provision was not a reasonable pre-breach estimate of damages; because plaintiff

forceable penalty. *See Rodriguez v. Learjet, Inc.,* 24 Kan.App.2d 461, 464–65, 946 P.2d 1010 (1997). In support of its argument that burden of proof is a procedural issue, plaintiff relies solely on *Amoco Production Co. v. Douglas Energy Co.,* 613 F.Supp. 730 (D.Kan. 1985). As defendant points out in its papers,

the court in *Amoco* did not hold that burden of proof is a procedural issue and, in fact, the court was addressing a wholly separate issue—whether a new state statute should be applied to pending litigation. *See Amoco,* 613 F.Supp. at 737–38. In short, plaintiff's argument here is without merit.

suffered no actual damages; and because the stipulated damages bear no reasonable relationship to plaintiff's actual damages. Defendant further contends that plaintiff's conduct constitutes a waiver of its claim for stipulated damages and that plaintiff, under the terms of the lease, is precluded from recovering liquidated damages for the period of time after the theater opened for business. As set forth in more detail below, genuine issues of material fact exist with respect to whether the 4 to 1 provision is an appropriate liquidated damages provision or an unenforceable penalty. Moreover, the court rejects defendant's waiver and preclusion arguments.

## A. The Parties' Intent

 Defendant's initial argument in support of its motion for summary judgment focuses on the parties' intent. In that regard, defendant highlights various documents, discovery responses and deposition excerpts in which Mssrs. Dill and Rash, the primary lease negotiators for Yale 41 and AMC, respectively, describe the 4 to 1 provision as a "penalty." Defendant contends that this evidence conclusively demonstrates that the parties believed the provision was in fact a penalty. According to defendant, "when experienced business people involved in the negotiations of the 4 to 1 provision agree that the provision provides for a penalty, it would be unreasonable to conclude otherwise."

The court finds defendant's argument unpersuasive. First, the argument finds little support in both Oklahoma law and authoritative treatises. According to the Supreme Court of Oklahoma, it is well settled that in determining whether a particular clause calls for liquidated damages or for a penalty, the name given to the clause by the parties "is but of slight weight, and the controlling elements are the intention of the parties and special circumstances of the case." *See Fretwell,* 764 P.2d at 152 (citation omitted). Farnsworth has also rejected defendant's argument:

 Although courts occasionally still allude to the intention of the parties, these references are fast disappearing. There is no good reason why a stipulation should not stand as one for liquidated damages, even though its purpose may have been that of coercion. Since the proscription is based on a policy against compulsion, the question is not whether the parties intended the stipulated sum as a penalty, but whether the stipulation has the effect of compelling performance. For this reason, the parties' own characterization of the sum as "liquidated damages" or as a "penalty" is not controlling.

E. Allan Farnsworth, *Contracts* § 12.18 (2d ed.1990). While under Oklahoma law, intention of the parties may remain important, there is no indication that Oklahoma law would treat characterization as a penalty to be controlling on the issue of intent. According to these principles, then, the mere fact that the parties here described the provision as a "penalty" has little bearing on the ultimate determination of whether the provision is in fact a penalty.[7]

 Moreover, plaintiff has set forth ample evidence reflecting that the parties, regardless of the label they attached to the provision, attempted to arrive at a damage

---

7. On a related issue, defendant has filed a motion to reconsider an amendment to the pretrial order (doc. # 107). By way of background, the court entered an order granting plaintiff's motion to amend the pretrial order by striking certain spreadsheets reflecting plaintiff's damages calculations and replacing those spreadsheets with updated (and reduced) damages calculations. In its motion to reconsider, defendant objects to the original spreadsheets being stricken rather than simply amended because the original spreadsheets refer to plaintiff's damages as "penalty calculations" while the updated spreadsheets delete that reference. For the same reasons set forth above (*i.e.,* the fact that plaintiff described its damages calculations as penalty calculations has little bearing on the ultimate determination of whether the provision is in fact a penalty), defendant's motion to reconsider is denied.

formula that would compensate plaintiff (*i.e.*, not penalize defendant) for the harm it would suffer if defendant failed to deliver the pad site in a timely fashion and/or failed to complete construction of certain tasks associated with the shopping center. Mr. Rash, for example, testified that he explained to Mr. Dill that AMC's request for the 4 to 1 provision was based on the relationship between rent and operating income, the potential income to be derived from the building, and the risks AMC would assume if Southroads missed the deadlines. Plaintiff's evidence further demonstrates that Mr. Rash, in negotiating the 4 to 1 provision, considered the potential loss of goodwill and the risks of having to build AMC's theater on a construction site, including the risk of building a theater with poor street visibility in an otherwise uncompleted shopping center. This evidence tends to suggest that the parties intended to compensate plaintiff for the loss it would suffer as a result of a breach by defendant. Accordingly, the court will not construe the provision as a penalty simply because the parties described it as such. *See* Farnsworth, *supra,* § 12.18 (noting trend of enforcing clauses "as long as they do not clearly disregard the principle of compensation").

## B. *Whether Ascertaining Damages at Time of Contracting Was Impracticable or Extremely Difficult*

According to defendant, the 4 to 1 provision is invalid under Oklahoma law because ascertaining damages at the time of contracting was neither difficult nor impractical. *See Waggoner v. Johnston,* 408 P.2d 761, 769 (Okla.1965) (whether damages are difficult of ascertainment is to be determined "as of the time the contract was entered into and not at the time of the breach." ) (citing *Knapp v. Ottinger,* 206 Okla. 113, 240 P.2d 1083, 1087 (1951)). In its papers, defendant challenges separately the 4 to 1 provision as it relates to the turnover date and as it relates to the completion date.

### 1. Turnover Date

According to the first amendment to the lease, defendant was to provide to AMC by November 15, 1996 (the "turnover date") a pad site with utilities on which AMC would construct its megaplex movie theater. Defendant maintains that plaintiff, at the time of contracting, knew that if defendant failed to provide the pad site in a timely fashion and if plaintiff was delayed in opening the theater as a result of defendant's breach of the turnover date, then any damage plaintiff would suffer as a result of the breach would be in the form of lost income. According to defendant, plaintiff's lost income was easy to estimate at the time of contracting in light of available income figures from other theaters owned and operated by plaintiff and based on various financial analyses for the Southroads 20 in which plaintiff had "routinely analyzed and estimated" the projected income for the theater.

Plaintiff, however, has set forth evidence suggesting that damages stemming from defendant's failure to meet the turnover date would be difficult to ascertain. According to plaintiff's evidence, megaplexes were an entirely new concept at the time the parties executed the lease agreement in December 1995. In fact, plaintiff's first megaplex, located in Dallas, Texas, had opened only six months earlier. In other words, plaintiff could not simply look to the profitability of its smaller theaters for an accurate estimate of what its new, substantially larger theater complexes would earn. For these reasons, according to plaintiff's evidence, the profitability or operating income of a megaplex was difficult to predict with reasonable certainty. Plaintiff contends that this difficulty was enhanced by the fact that plaintiff, prior to the Southroads 20, had never owned or operated a theater in the Tulsa market. The difficulties that plaintiff faced in estimating the profitability of the Southroads 20 are further reflected in the numerous and varying projections that plaintiff generated in connection with the Southroads 20.

In short, defendant has failed in its summary judgment burden to show that the uncontroverted facts demonstrate that the damages plaintiff would incur as a result of defendant's failure to meet the turnover date were not extremely difficult to ascertain at the time of contracting. That is not to say that plaintiff could not have attempted to do so, or that plaintiff would have found it impossible to present evidence at a future trial to support a damage claim. Oklahoma law, though, does not go that far. It requires only extreme difficulty, not total impossibility.

## 2. Completion Date

Under the terms of the lease and the September 1996 amendment thereto, defendant was to complete by May 30, 1997 (the "completion date") a variety of tasks related to the Southroads shopping center. Defendant argues that plaintiff, at the time of contracting, knew that if defendant failed to complete the specified tasks in a timely fashion, then any damage plaintiff would suffer as a result of that failure would be in the form of lost income (for any delay in opening the theater) and increased construction costs (for problems relating to work coordination).[8] According to defendant, plaintiff should have reasonably known at the time of contracting that such damages could be determined with "relative precision" at the time they were incurred. As set forth above, defendant has fallen short of demonstrating that the uncontroverted facts establish that plaintiff's potential lost income from such a breach was not difficult to ascertain at the time of contracting. With respect to de-

fendant's argument concerning increased construction costs, plaintiff highlights that defendant simply ignores "significant categories of harm" incurred by plaintiff as a result of defendant's failure to meet the completion date. In that regard, plaintiff emphasizes the loss of customers who might have learned about the theater while shopping at the center before the theater opened for business. According to plaintiff, then, even if increased construction costs could have been easily estimated, the "remaining elements of AMC's harm could not have been easily estimated." For purposes of summary judgment, the court agrees. Defendant's delay in completing the shopping center could have imperiled AMC's relations with potential customers who otherwise would have been shopping at the center. Such a harm—a "diminution of future contractual opportunities— would be difficult to quantify, making a provision for liquidated damages highly appropriate." See Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1161 (7th Cir.1997) (Posner, J.).

## C. Reasonable Pre–Breach Estimate of Probable Loss or Reasonably Proportionate to Probable Actual Harm

■■■ In addition to considering whether the damages were difficult to ascertain, the Supreme Court of Oklahoma has instructed that "the most important fact[ ] to be considered [is] ... whether the stipulated amount is a reasonable estimate of probable damages or is reasonably proportionate to the actual damage sustained at the time of the breach." See Waggoner v. Johnston, 1965 OK 192, 408 P.2d 761, 769–70 (1965) (citations omitted).[9] As subse-

---

**8.** Defendant's argument with respect to whether damages associated with the completion date were difficult to ascertain relates only to the time period from May 30, 1997 through November 20, 1997 (i.e., the time period prior to the opening of the theater). For purposes of its motion for summary judgment, defendant assumes that plaintiff's damages due to defendant's failure to meet the completion date were difficult to ascertain to the extent the damages are measured from November 21, 1997 (the date plaintiff opened its theater for business) through July 31, 1998

(the date when, according to plaintiff, defendant finally completed the tasks associated with the shopping center and described in the lease).

**9.** In its papers, defendant suggests that plaintiff must prove both that the stipulated amount is a reasonable pre-breach estimate of probable loss and that the amount is reasonably proportionate to the actual damage sustained. The Waggoner opinion, however, clearly indicates that the test is a disjunctive one—that plaintiff must prove either that the

quent decisions clarified, however, where actual damages are by their nature uncertain, liquidated damages are permitted where they are not clearly disproportionate to *probable* actual harm. *See B & B Lines, Inc. v. Ryan Freight Lines, Inc.,* 1979 Ok Civ App 54, 601 P.2d 1207, 1209 (1979).

Before turning to analyze whether plaintiff's evidence is sufficient to show that the stipulated amount is a reasonable pre-breach estimate of probable loss or is reasonably proportionate to plaintiff's probable actual loss, the court must address defendant's argument that plaintiff, in fact, suffered no actual loss.[10] With respect to defendant's breach of the turnover date, defendant contends that plaintiff suffered no actual damages because plaintiff intended to open for the 1997 holiday season and did, in fact, open for the 1997 holiday season. Thus, according to defendant, plaintiff did not lose any income it would have otherwise earned. In essence, defendant maintains that the Southroads 20 opened on time, as scheduled. The record before the court, however, contains evidence that plaintiff, at the time the lease was executed, intended to open the theater during the summer of 1997. The record also contains evidence from which one could easily infer that plaintiff could have opened its theater during the summer of 1997 if defendant had met the November 15, 1996 turnover date. Finally, plaintiff's evidence demonstrates that factual issues exist with respect to whether plaintiff, at the time the September 1996 amendment to the lease was executed, still believed

that a Summer 1997 opening was feasible.[11]

With respect to defendant's breach of the completion date, defendant contends that plaintiff suffered no actual damages prior to the opening of the theater. In response to plaintiff's argument that it suffered an increase in construction costs, defendant argues that plaintiff's actual costs were "under budget." According to plaintiff's evidence, however, defendant's argument is based on a misreading of the certain line items on the budget and subsequent billing. Plaintiff maintains that the agreement between it and its construction manager estimated $120,389 for "general conditions" but that plaintiff actually paid $219,229, in part because of defendant's delay in completing the center. Moreover, plaintiff's evidence suggests that plaintiff paid nearly $80,000 over budget for increased staffing needs, in part because of defendant's delay.

Defendant also challenges plaintiff's argument that it lost customers who could have learned about the Southroads 20, prior to its opening, while shopping at the Southroads shopping center. Similarly, defendant challenges plaintiff's argument that, after the theater opened, plaintiff lost customers who were unable to combine a trip to the movies with a shopping trip to the center and lost "goodwill" because customers were required to attend the theater while the center was in the middle of "massive construction." According to defendant, plaintiff simply has no

stipulated sum is a reasonable pre-breach estimate or that the sum is reasonably proportionate to actual loss.

10. It is unclear whether Oklahoma courts would construe a stipulated damages provision as an unenforceable penalty solely on the basis that no actual damages were in fact sustained. Courts seem to be split on the issue. According to Farnsworth,

> Some courts have ... enforced the provision as one for liquidated damages, weighing the practical advantages of upholding a forecast that seemed reasonable when made, over the disadvantages of allowing a

party to recover although it has sustained no loss. Other courts have characterized the sum as a penalty, even though this results in a somewhat arbitrary distinction between situations in which there is no loss at all and those in which there is only a little loss.

E. Allan Farnsworth, *Contracts* § 12.18 (2d ed.1990) (and cases cited therein) (footnotes omitted).

11. In early 1997, for example, plaintiff erected a large sign on the construction site announcing the opening of the Southroads 20 in "Summer 1997."

evidence, or "proof", that it actually lost customers or goodwill. Defendant further asserts that plaintiff is somehow precluded from claiming a loss of goodwill because it was not an established business. The court finds these arguments unpersuasive at this stage of the proceedings. As plaintiff highlights in its papers, the difficulty in quantifying the loss of customers and goodwill is exactly why a liquidated damages provision is desirable. *See Lawyers Title Ins. Corp. v. Dearborn Title Corp.,* 118 F.3d 1157, 1161 (7th Cir.1997) (Posner, J.) (difficulty in quantifying loss of future contractual opportunities, or goodwill, makes liquidated damages appropriate); *accord B & B Lines, Inc. v. Ryan Freight Lines, Inc.,* 1979 Ok Civ App 54, 601 P.2d 1207, 1209 (1979) (liquidated damages are permitted where the actual damages are by their nature uncertain). In any event, plaintiff's evidence with respect to lost customers and goodwill is sufficient. Sean Ervin, an agent of AMC, testified as to numerous complaints that theater management received (as many as 100 per week) from customers concerning the condition of the shopping center. Some of these customers indicated that they would not return to the theater. Customers also informed theater management that they had not realized the theater was open because the rest of the center did not appear to be open. Moreover, the Southroads 20 experienced a decrease in sales from its opening figures. Such evidence is sufficient, for purposes of summary judgment, to demonstrate a loss of goodwill and lost customers. *See Harolds Stores, Inc. v.*

*Dillard Dep't Stores, Inc.,* 82 F.3d 1533, 1547 (10th Cir.1996) ("A corporate officer familiar with company history, financial statements, and customer relations may offer opinion testimony as to the extent the company sustains damages to its goodwill."); *see also Westric Battery Co. v. Standard Elec. Co.,* 522 F.2d 986, 987 n. 2 (10th Cir.1975) (the amount of goodwill lost cannot and, thus, need not be proven with absolute precision).[12]

■ The court also rejects defendant's argument that plaintiff, as a "new" business, cannot claim a loss of goodwill. In support of its argument, defendant relies solely on *Freeling v. Wood,* 1961 OK 113, 361 P.2d 1061, 1063 (1961) for the proposition that only an "established" business can secure goodwill.[13] According to defendant, the Southroads 20 was only open for eight months during the time period for which plaintiff is seeking stipulated damages. Defendant urges that a business open for eight months, as a matter of law, cannot be an established concern. Defendant offers no authority for this assertion. In the absence of any Oklahoma case supporting defendant's assertion, the court is unwilling to conclude that Oklahoma would preclude plaintiff from recovering loss of goodwill as a matter of law. In any event, the court rejects defendant's argument for a more fundamental reason. While a "new" business might not be able to recover damages for loss of goodwill (or future profits) because the quantification of such damages would be speculative, that uncertainty is the very reason why a liquidated

---

12. Defendant also argues that plaintiff cannot complain about lost customers who might have learned about the theater while shopping if the center had been completed on time because nothing in the lease required defendant to have other stores open for business during this time period. At best, what the parties contemplated at the time of contracting in terms of the ramifications of defendant's failure to satisfy these lease provisions is a question of fact to be resolved at trial. In any event, defendant's argument fails to recognize that plaintiff cites a number of different categories of harm that it suffered and, moreover, that plaintiff does not have to

prove the actual damages it suffered. The key is whether plaintiff's *probable* damages, at the time of contracting, were difficult to ascertain and whether the stipulated sum is a reasonable estimate of that probable loss.

13. The *Freeling* decision bears no resemblance to the facts presented here and offers no guidance whatsoever on what constitutes an "established" business. The *Freeling* court simply defined "goodwill" in the context of a discussion concerning whether the goodwill of a partnership was an asset of the partnership.

damages provision might be appropriate. In other words, the task here is not to calculate the precise dollar amount that plaintiff lost in terms of damage to its goodwill, but to determine whether plaintiff suffered a loss at all and, if so, whether the stipulated damages provision was reasonable.

Having rejected defendant's argument that plaintiff in fact suffered no actual damages (or, more precisely, that plaintiff lacks any evidence of actual damages), the court turns to analyze whether plaintiff's evidence is sufficient to show that the stipulated amount is a reasonable pre-breach estimate of probable loss or is reasonably proportionate to plaintiff's probable actual loss.

### 1. Prior to Opening of Theater

According to plaintiff's evidence, the stipulated sum is reasonably proportionate to plaintiff's probable actual harm suffered in connection with the time period prior to the opening of the Southroads 20.[14] The Southroads 20 generated $14,093 in operating income per day during the first four and one-half months it was open—a period during which the theater had no comparable competition in the Tulsa market. Thus, if the theater had been able to open earlier, as planned, then plaintiff would have had a longer period of operation in which it was the only megaplex in Tulsa and, presumably, would have earned similar profits to those earned once it eventually opened. Moreover, it is certainly conceivable that plaintiff's profits, in fact, would have been higher but for the loss of goodwill that it claims, *e.g.*, the loss of customers who might have learned about the theater while shopping at the center if the center had been completed on time. The stipulated sum, by contrast, is just $9,856 per day. As plaintiff notes in its papers, plaintiff's estimate of its damages at the time of contracting may have been too low. In any event, defendant seems to concede in its reply brief that the stipulated sum "might not be disproportionate" to the harm plaintiff suffered prior to the theater's opening. Defendant has not established that the uncontroverted facts fail to show that the stipulated sum was reasonably proportionate to plaintiff's probable actual loss.

### 2. After Opening of Theater

Defendant maintains that the stipulated sum is unconscionable with respect to the damages plaintiff suffered after the theater opened. In that regard, defendant highlights that plaintiff seeks $9,856 per day during a time period when plaintiff was actually earning approximately $14,000 per day in operating income. According to defendant, permitting plaintiff to recover, in essence, more than $23,000 per day is simply unreasonable in light of pre-opening projections that the Southroads 20 would earn only $6000 per day in operating income. Defendant concludes that plaintiff would recover a windfall in such circumstances.

As plaintiff points out in its papers, however, defendant's argument again ignores plaintiff's evidence that it suffered (and, perhaps, continues to suffer) a loss of goodwill. It is feasible that plaintiff lost customers who, because they could not combine a shopping trip at the center with a movie, selected another theater in town. Likewise, it is certainly possible that customers who had negative experiences at the Southroads 20 (*e.g.*, sliding down muddy hills where no sidewalks were available; getting hit by cars when having to walk in the road) would not return to the theater and, moreover, that those customers shared their experiences with other moviegoers in the market. This harm, which cannot be quantified, tends to suggest that the stipulated sum is not necessarily disproportionate to plaintiff's probably actual loss. This is particularly true in light of the fact that plaintiff's earnings declined

---

14. The time period is measured from November 16, 1996 through March 11, 1997 (turnover date damages) and again from May 30, 1997 through November 21, 1997 (completion date damages/prior to opening).

substantially after other comparable theaters opened in the Tulsa market.[15] Although the call is much closer on this point than it is with regard to pre-opening harm, plaintiff's evidence requires a trial on this issue.

### D. Waiver

■ Defendant also maintains that plaintiff has waived its claim for stipulated damages. According to defendant, plaintiff did not notify defendant of its intent to seek stipulated damages until February 1998—nearly fifteen months after the November 1996 turnover date and eight months after the May 1997 completion date. Plaintiff's inaction, in defendant's view, manifests an intent to relinquish its rights under article 5 of the lease. Defendant further maintains that plaintiff, by its conduct, has waived the "anti-waiver" provision of the lease. A review of the pretrial order in this case, however, reveals that defendant has failed to preserve its waiver defense. Thus, defendant's argument based on plaintiff's alleged waiver has, itself, been waived. *See* Fed.R.Civ.P. 8(c). For this reason, the court declines to address the merits of the defense.

### E. Whether Plaintiff, Under the Terms of the Lease, is Precluded from Recovering Liquidated Damages for the Period of Time After the Theater Opened

■ Defendant's final argument in support of its motion for summary judgment is that plaintiff, under the terms of the lease, is precluded from recovering liquidated damages for the period of time after the theater opened for business. According to defendant, the specific provisions of the lease allowed plaintiff to decide whether to open for business before the shopping center was completed. In other words, plaintiff was not required to open its theater until the shopping center was finished. Moreover, under the terms of the lease, if plaintiff elected to open

before the center was completed, plaintiff's rent constituted a percentage of its gross receipts (rather than the standard fixed rent amount). According to defendant, then, plaintiff has already received a remedy (in the form of reduced rent) for operating its theater while the center was still under construction. Defendant argues that plaintiff would receive a windfall if plaintiff, in addition to enjoying a reduced rent, were permitted to recover liquidated damages for this time period.

The problem with defendant's argument is that it is simply not supported by the language contained in the lease agreement. The lease does not require plaintiff to elect one remedy over another. Similarly, the lease does not state that one remedy shall be "exclusive" of another remedy. In fact, as plaintiff highlights, article 37(A) of the lease expressly provides that all rights and remedies under the lease "shall be cumulative, irrespective of whether so expressly stated." For these reasons, the court rejects defendant's argument that plaintiff is precluded from seeking liquidated damages during the time period that it was paying a percentage rather than fixed rent.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc. # 95) is **denied** and defendant's motion to reconsider an amendment to the pretrial order (doc. # 107) is **denied.**

**IT IS SO ORDERED.**

---

**15.** While plaintiff's decrease in sales may be attributed to the increase in competition, plaintiff maintains that the problems at the Southroads shopping center inevitably made

the competition look more attractive to patrons who had negative experiences at the Southroads 20.